IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 14–534 CRB |
| Plaintiff, | **ORDER SUPPRESSING ELECTRONIC SURVEILLANCE EVIDENCE COLLECTED AT SAN MATEO COUNTY COURTHOUSE** |
| v. | |
| JOSEPH J. GIRAUDO, RAYMOND A. GRINSELL, KEVIN B. CULLINANE, JAMES F. APPENRODT, and ABRAHAM S. FARAG, | |
| Defendants. | |

Defendants move to suppress over 200 hours of audio recordings that the FBI surreptitiously collected, without judicial authorization, at the San Mateo County Courthouse. See Motion (dkt. 58). The government responds that Defendants did not have a reasonable expectation of privacy at the courthouse because they were attending public foreclosure auctions held in an open area outside the building's entrance. See Opp'n (dkt. 144). The Court—after holding days of evidentiary hearings, reviewing multiple rounds of briefing, and analyzing the relevant authorities on this question—concludes that the government has utterly failed to justify a warrantless electronic surveillance program that recorded private conversations spoken in hushed tones by judges, attorneys, and court staff entering and exiting a courthouse. Even putting aside the sensitive nature of the location here, Defendants have established that they believed their conversations were private and that they took reasonable steps to thwart eavesdroppers. The Fourth Amendment prohibits the

**United States District Court**
For the Northern District of California

1   introduction of evidence that was gathered in violation of a defendant's constitutional rights.

2   Accordingly, the Court GRANTS the motion to suppress the disputed electronic surveillance

3   evidence.

4   **I.      FACTUAL AND PROCEDURAL BACKGROUND**

5           This factual background draws from evidence presented by the parties over three

6   separate days of evidentiary hearings.  The Court made a number of factual findings on the

7   record, see Hearing Trs. (dkts. 94, 102, 129), and makes additional factual findings below.

8   See United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995).

9           **A.      Background and Location of the San Mateo Foreclosure Auctions**

10          The public real estate foreclosure auctions—also known as trustee sales—that gave

11  rise to this case took place in 2009 and 2010 at the San Mateo County Courthouse in

12  Redwood City, California.  See Feb. 11 Tr. (dkt. 94) at 183:15–184:4.  The auctions typically

13  began around 12:30 PM in front of an employee entrance to the courthouse.  Id. at

14  187:17–19.  Participants arrived at the location a few minutes before the auction began, and

15  six to sixteen people usually attended.  Id. at 187:14–16; April 5 Tr. (dkt 129) at 31:21-32:4.

16  Between five and ten properties were auctioned at a typical trustee sale.  Feb. 11 Tr. at

17  198:12–15.  Anyone could participate in the auctions.  Id. at 197:22-25; April 5 Tr. at 52:3-5.

18          The auction site roughly extended from the wall of the courthouse to the curb, a

19  distance of about 26 feet.  See Feb. 11 Tr. at 189:18–24.  The area was not enclosed—people

20  could enter and exit the site without restriction, but pillars in the auction area sometimes

21  obscured participants' lines of sight.  See Feb. 29 Tr. (dkt. 102) at 59:14–17; April 5 Tr. at

22  30:1–10, 53:1–15.  Courthouse employees and others using the sidewalk often walked by the

23  auction site.  See Feb. 11 Tr. at 110:8–13, 194:20–195:7.  Auctioneers would generally stand

24  in three areas at the courthouse: to the left of a pillar against the courthouse wall; on a bench

25  next to a sprinkler box against the wall; and to the right of the bench near a planter box.  See

26  id. at 188:9–189:4.  Bidders moved around these areas.  Id. at 189:5–14.

27

28

**United States District Court**
For the Northern District of California

2

United States District Court
For the Northern District of California

**B.      FBI Investigates Bid-Rigging and Fraud at San Mateo Auctions**

In October 2009, the FBI began investigating allegations of bid-rigging and fraud at the foreclosure auctions held at the San Mateo courthouse.  See Feb. 11 Tr. at 64:20–25. Several auction participants contacted the Department of Justice Antitrust Division and reported corruption.  Id. at 181:2–11.  The FBI opened an investigation.  Id.

Two of the individuals who reported the alleged bid-rigging cooperated with the FBI. Id. at 65:9–14, 181:12–14.  One of these cooperators told the FBI that he had participated in corrupt auctions and deals with a group of regular auction participants.  Id. at 57:14–58:22, 65:19–66:14.  These regulars included Defendants Joe Giraudo, Ray Grinsell, and Kevin Cullinane along with alleged co-conspirators Mo Rezaian and Dan Rosenbledt.  Id.  The cooperator agreed to wear a wire at several auctions and recorded conversations with Defendants.  Id. at 66:15–20.  The FBI used video cameras and agents to visually surveil the auctions.  See id. at 65:4–8; Def. Ex. 6 ¶ 2; Def. Ex. 1 at 2.  An undercover agent posing as an investor for one of the cooperators also wore a wire and made audio and video recordings of Defendants on a number of occasions.  See Feb. 11 Tr. at 66:21–67:6, 181:15–25.  These investigatory techniques do not require judicial authorization, nor are they viewed as a infringing on a defendant's constitutional rights in this context.

**C.      The FBI's Initial Success Investigating Through Cooperating Witnesses, Undercover Agents, and In-Person Audio Recordings**

According to the lead FBI agent assigned to this case, the FBI's (1) interviews with cooperators, (2) initial audio recordings collected by individuals wearing wires, and (3) video surveillance were all "working very well," id. at 67:7–12, had captured "evidence of the direct payoffs," id. at 207:9–17, and "were succeeding," id. at 71:10–12.  In-person wire recordings made by the cooperator and the undercover agent captured multiple allegedly illegal payments involving a Daly City, California property.  Id. at 67:13–17, 160:13–18; Def. Ex. 6 ¶ 6(a).  These recordings also allegedly captured Defendants "engaging in discussions to arrange the details of their bid rigging and fraudulent conduct."  See Def. Ex. 6 ¶ 6(b).  According to the FBI, these conventional investigative techniques "basically corroborated almost, almost everything that the cooperators said in the initial part of the

3

United States District Court
For the Northern District of California

investigation." See Feb. 11 Tr. at 207:9–17, 183:5–14.  An investigating FBI agent testified

that he could not have sworn an affidavit stating that the FBI had tried traditional

investigative procedures and failed to collect evidence of suspected bid-rigging and fraud.

Id. at 73:9–13.  This testimony suggests that a Title III wiretap application pursuant to 18

U.S.C. § 2518(1)(c) could not have been successfully obtained.  However, it does not raise

any impediment to obtaining a search warrant pursuant to the Fourth Amendment.

### D.    Conversations that Defendants Shielded from the FBI

After the FBI's initial success using cooperators, undercover agents, body wires, and

video surveillance, Defendants' relationship with the cooperator "soured."  See Feb. 11 Tr. at

56:16-23.  According to FBI agents, Defendants decided they "definitely did not want the

[cooperating] source to overhear [their] conversation[s]."  See Feb. 11 Tr. at 155:13–17.  An

agent stated that it became "typical behavior" for Defendants and the alleged co-conspirators

to hold conversations "separate[ly] from [the] informant and from [the] undercover agent,

and it was unlikely that [the FBI] [was] going to capture . . . [further] bid rigging using

them."  Id. at 145:16–146:5, 148:11–25, 153:2–11.  The lead FBI agent went so far as to

testify that "the key observation made in the early part of the case" was that the cooperator

and undercover agent "could not hear" Defendants' conversations.  Id. at 155:7–12.[1]

At this point in the investigation, Defendants would "routinely would walk away from

a larger group, stand close to the individuals with whom [they] [were] speaking, cease

conversations when others approached, try to speak out of earshot of other people, or speak

quietly or whisper."  Def. Exs. 66-69 ¶ 7.  The lead FBI investigator described Defendants as

"talking among themselves," "talking together," and "separately speak[ing]" around this time

period.  See Def. Ex. 9 (12:34 pm; 1:07 pm; 1:16 pm).  Defendants and other alleged co-

conspirators whispered in each other's ears during numerous conversations.  See Def. Ex. 9

(1:59 pm; 12:23 pm – 13:10 pm).  They would also break off into small groups to confer.

---

[1] One of the investigating FBI agents initially contradicted the lead agent's testimony and stated that he had successfully eavesdropped on conversations at the auctions after the cooperator's relationship with Defendants soured, but upon questioning from the Court, he reversed course and stated that Defendants participated in conversations he was unable to hear.  See Feb. 29 Tr. at 214–15; Def. Ex. 22 (noting that agent wrote in his report that it was "unclear what [Defendants] were discussing").

<u>See</u> Def. Ex. 41 (12:59 pm); Def. Ex. 42 (12:34 pm; 13:05 pm).  Defendant Grinsell, for example, testified that he would keep a close eye on the people near him, speak in a lower voice or stop talking when strangers approached, and do "everything possible to make sure nobody else heard [his] conversation[s]."  <u>See</u> April 5 Tr. at 46:14–20; <u>see also</u> <u>id.</u> at 40–52.

Grinsell explained Defendants' behavior, testifying that it was critical for bidders to shield certain sensitive conversations from eavesdroppers at the auctions because bidders were surrounded by competitors.  <u>See</u> April 5 Tr. at 40:14–20 ("There were private conversations going on while the auctions were being conducted.").  If a bidder "talked openly about what they were going to bid, the condition of the property or anything else, it would work contrary to their interests in getting the property."  <u>Id.</u> at 43:19–44:1.  It was thus "difficult" and "rare" to overhear another bidder's conversation.  <u>Id.</u> at 43:12–25.

### E.    The FBI Institutes an Electronic Surveillance Program After Defendants Shield Their Privacy

After Defendants took steps to protect the private nature of their conversations, FBI agents concluded that they "needed some new technique," Feb. 11 Tr. at 72:13–73:4, if they were going to "capture additional evidence," Def. Ex. 6 ¶ 7.  The FBI adopted a new technique: agents bugged the courthouse.  The FBI used hidden microphones to establish an electronic surveillance program that collected more than 200 hours of audio recordings over nine months, capturing the conversations of anyone who entered or exited the employee entrance of the courthouse.  Regardless of whether that person was a defendant, a county employee, an attorney, a judge, or a member of the public.  The FBI never sought judicial authorization for this program.  <u>See</u> Feb. 11 Tr. at 36–38, 145:9-19, 182:20-24; Def. Ex. 2.

Agents planted stationary microphones in four locations around the courthouse: in a sprinkler box, in a planter box, in unmarked police vehicles parked on the street in front of the courthouse, and in a backpack.  Feb. 11 Tr. at 115:9–20; 36:3–16.  The sprinkler box was located to the left of a bench against the wall, about ten to thirteen feet from where the auctions typically took place.  Def. Ex. 5; Def. Ex. 57; Feb. 11 Tr. at 113:24–114:7, 206:4–8. The planter box was located eight to ten feet from where the auctioneer typically stood.  Feb. 11 Tr. at 114:9–13, 205:6–14.  The unmarked vehicles—which concealed two recording

devices, one recording both audio and video and one recording only audio, id. at 203:23–204:4,  were parked approximately thirty feet from where the auctions took place, id. at 205:2–5.  The FBI backpack microphone was dropped off in the auction area near a mailbox to "capture a different side of the auction." Feb. 29 at 214:1–9.  The presence of these microphones "was unknown to anybody but the case agent." Feb. 11 Tr.  at 220:4–10.

The microphones themselves were "small digital recorders" known as Knowles EM-23069s, were "one-and-a-half inch square," and were "specifically designed for" law enforcement. Id. at 140:21–24, 199–200.  The device is also used in hearing aids.  Id. at 200:19–22.  The parties here did not present expert testimony regarding the effectiveness of the devices, but they generally agreed that the microphones were no more effective than the human ear.  See id. at 141:14–142:11, 214:8–25.  The government declined Defendants' request to test the effectiveness of the devices.  See Def. Br. (dkt. 136) at 13 n.9.

Between December 2009 and September 2010, the FBI activated these stationary microphones on at least twenty-eight days.  See Def. Ex. 2; Feb. 11 Tr. at 38:12–20, 47:16–20, 207:18–209:16; Feb. 29 Tr. at 246:20–21.  Sometimes the FBI used the devices' internal timers and sometimes it manually activated them. Feb. 11 Tr. at 104:6–24.  Agents frequently turned on the devices "well before the auction start[ed]" and left them running until "well after the auction . . . ended." Id. at 109:9–16.  The devices often recorded activities at the courthouse entrance for several hours, in some cases for up to five hours continuously.  See Def. Ex. 2; Feb. 11 Tr. at 105:11–14.  At no time did the agents monitor the recordings in real time to ensure that they were not recording privileged or private conversations. Feb. 11 Tr. at 103:21–24, 105:15–18; Feb. 29 Tr. at 246:22–247:7.  Nor did the agents make any effort to record only those individuals who were participating in the auctions. Feb. 29 Tr. at 210:12–15.  The FBI recorded approximately 214 hours of conversations over nine months. Id. at 156:11–15; Feb. 11 Tr. at 43:17–21, 47:3–15.

**F.      FBI Captures Private Conversations Through Electronic Surveillance**

The electronic surveillance program at issue here recorded private conversations to which Defendant and others were parties.  The Court finds—based on the evidence outlined

6

below—that the stationary microphones captured conversations that FBI agents or a general passerby could not have eavesdropped on in person.

### 1.       Private Conversations Between Defendants

The Court finds that the FBI's electronic surveillance program recorded numerous conversations which could not have been overheard except by a participant in that conversation.  FBI agents noted that the express purpose of the electronic surveillance program was to "[c]apture the conversations that were separate from [the FBI's] undercover agents and informants," conversations that they "were not invited to join."  Feb. 11 Tr. at 145.  The eavesdropping program achieved that goal.  FBI agents stated that the recordings they collected from the stationary microphones were "important and incriminating," "had evidentiary value,"—in short, they were "gold."  See Feb. 29 Tr. at 65–67, 106.  The lead FBI agent acknowledged that the recordings were "helpful, useful, credible evidence."  See Feb. 29 Tr. at 108:20–110:20.

FBI Agents noted that the "planter mic" was able to capture an alleged co-conspirator discussing a financial transaction in a conversation that the undercover FBI agent "was not privy to."  See Def. Ex. 3, 5/15/10 20:10:14.  The stationary microphones caught Defendant Rosenbledt discussing "percentages" with two other Defendants, see Def. Ex. 48 (2:33 pm), Defendant Appenrodt and the cooperator discussing payments, see Def. Ex. 42 (12:39 pm), and Defendant Grinsell discussing a "deal being made," see Def. Ex. 50 (1:20 pm).  FBI agents later used recordings from the electronic surveillance program to seek a warrant for a Defendant's phone.  See Feb. 29 Tr. at 105:5–10.  They also showed stationary microphone recordings to alleged co-conspirators during interviews.  Def. Ex. 11 at 6–7; Def. Ex. 16 at 8.

### 2.       Private Conversations Between Members of the Public

The Court also finds ample evidence that the FBI's eavesdropping program captured private conversations between members of the general public.  For example, a stationary microphone near the courthouse entrance recorded two women discussing details of their personal lives that ranged from the private to the salacious.  See Def. Ex. 51 (1D070.003,

Clips 1–4).[2]  The FBI agent who recorded and reviewed this conversation admitted that it was "certainly indicative of somebody who expects it to be private."  See Feb. 11 Tr. at 131:22–132:2.  The evidence confirms the agent's observation; the women stop speaking when others walk by.  Def. Ex. 51 (1D070.003, Clips 1–4).

The stationary microphones also captured private communications of a different sort—a conversation between a San Mateo Superior Court judge and a county prosecutor. See Def. Ex. 53 (1D044.004 at 00:01; 1D041.003 at 19:44; 1D043.004_part1 at 22:52; 1D044.003 at 11:05); Feuchtbaum Decl. (dkt. 142).  The judge and prosecutor discuss case loads, the quality of attorneys appearing before the judge, and a request from the judge that the prosecutor not blame his deputies for certain events.  See id.  The FBI agent in charge of the electronic surveillance program admitted that any such confidential legal discussions occurring near the courthouse entrance "would be captured."  See Feb. 11 Tr. at 107:17–108:1.  The Court thus finds—based on both this evidence and the evidence above involving Defendants—that the FBI's electronic surveillance program recorded conversations that speakers would not have participated in had FBI agents or members of the public, rather than hidden microphones, been in close physical proximity to them.

### G.    Absence of FBI Documentation on Electronic Surveillance Program

Throughout the FBI's nine month eavesdropping campaign, "there was no formal reporting or collection of statistics that was provided to anybody other than [the agents themselves]."  See Feb. 11 Tr. at 100:23–101:7.  Agents activated the stationary recording devices on twenty-eight days, excluding three days on which the devices were turned on for less than a minute.  See Def. Ex. 2.  The records of what occurred on these twenty-eight days are incomplete for the following reasons.

For fourteen of the twenty-eight days, there is either no written record of electronic surveillance at all, see Bauer Decl. (dkt. 59), or only a two sentence note that "a surveillance

---

[2]  Although slightly blue for the pages of the Federal Supplement, the general details of the conversation are as follows: a woman discussed physical intimacy with a boyfriend, a person stuffing a dollar bill down her bra, and her relationship insecurities—including references to an ultimatum planned for Valentine's Day.  See Def. Ex. 51 (1D070.003 and Clips 1-4); Dkt. 90 ¶¶ 4–7.  The record is silent as to whether the threatened ultimatum was issued.

United States District Court
For the Northern District of California

1  was conducted" and that it included one or more "recording devices" covering a certain time

2  period, Def. Exs. 10, 30–34, 37–39.  For six of the fourteen days without a written report or

3  with only a cursory report, the surveillance included only audio recordings.  See Def. Ex. 2

4  (2/3/10, 2/4/10, 2/17/10, 4/26/10, 5/21/10, 7/13/10).  The Court thus cannot determine

5  whether a bystander may have been ten feet, thirty feet, or 100 yards away from the speakers

6  whose conversations were recorded on those dates.  See Feb. 11 Tr. at 172:5–173:5.

7      For another five of the twenty-eight days involving electronic surveillance, FBI agents

8  drafted noncontemporaneous surveillance reports.  These reports are based on an agent's

9  subsequent review of the recordings.  Def. Exs. 41–42, 46–49.  For the remaining nine days,

10  an FBI agent purports to have contemporaneously documented what he observed at the

11  courthouse while the recording devices were on.  Def. Exs. 9, 18, 22, 27–29, 43–44, 50.

12  Although these reports appear to be based on real-time observation of the auctions, some

13  were actually created months after the fact.  See Def. Ex. 9 (surveillance on 1/4/10; report

14  dated 5/8/10); Def. Ex. 29 (surveillance on 1/11/10; report dated 5/9/10).  These reports give

15  little indication whether there were bystanders close enough to the microphones to have

16  heard Defendants' conversations.  See, e.g., Def. Ex. 27 (noting that Grinsell, Giraudo, and

17  Rosenbledt were having a conversation by the sprinkler box).

18      Finally, the government did not produce expert testimony on whether any of the

19  bystanders who were identified in video surveillance near the stationary microphones could

20  have overheard the private conversations between Defendants that were recorded on those

21  microphones.  The Court repeatedly invited such expert testimony.  See April 5 Tr. at

22  73:20–24 (calling for "a technical person who would say, standing at this place, at this

23  location, this number of feet from the microphone, this conversation could be overheard");

24  id. at 75:22–76:6 (calling for the same); id. at 79:11–13 ("And you're asking me to conclude

25  that these people who are walking by heard the conversation. There is no way I can do it

26  without some scientific evidence.").  The Court thus finds no evidence in the record

27  establishing whether bystanders actually could have overheard the conversations recorded on

28  each of the twenty-eight days in question.

United States District Court
For the Northern District of California

1

### F.    Procedural History

2
3
4
5
6

The government indicted Defendants on bid-rigging and fraud charges in October 2014.  Defendants have moved to suppress all 214 hours of stationary microphone recordings under the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968.  <u>See</u> Mot. (dkt. 58).  The Court accepted two full rounds of briefing and held three days of evidentiary hearings on this matter.  <u>See</u> Hearing Trs. (dkts. 94, 102, 129)**.**

7

## II.    LEGAL STANDARD

8
9
10
11
12
13
14
15
16

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "To invoke the protections of the Fourth Amendment, a person must show he had a legitimate expectation of privacy"—a "principle [that] was first articulated in <u>Katz v. United States</u>."  <u>See</u> <u>United States v. Nerber</u>, 222 F.3d 597, 601 (9th Cir. 2000).  To establish a legitimate expectation of privacy, "an individual must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was one that society is prepared to recognize as reasonable."  <u>See</u> <u>United States v. Young</u>, 573 F.3d 711, 715–16 (9th Cir. 2009) (citing <u>Bond v. United States</u>, 529 U.S. 334, 338 (2000)).

17
18
19
20
21
22
23
24
25
26

Title III prohibits the interception of "wire" and "oral communications . . . uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."  <u>See</u> <u>United States v. McIntyre</u>, 582 F.2d 1221, 1223 (9th Cir. 1978); 18 U.S.C. §§ 2510-2522.  Title III "reflects Congress's intent that <u>Katz v. United States</u>, 389 U.S. 347 (1967), serve as a guide to define communications that are uttered under circumstances justifying an expectation of privacy."  <u>Id.</u>  The Court's analysis under Title III thus mirrors the analysis under the Fourth Amendment, and "[g]uided by <u>Katz</u>, our inquiry is whether the communications overheard . . . were uttered by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable."  <u>See</u> <u>United States v. Freie</u>, 545 F.2d 1217, 1223 (9th Cir. 1976).

27
28

**United States District Court**
For the Northern District of California

## III.   DISCUSSION

After first reviewing Defendants' standing to challenge the stationary microphone recordings at issue here, the Court examines whether Defendants had a "subjective expectation of privacy" in their conversations at the San Mateo County Courthouse and whether that expectation was "objectively reasonable." See Young, 573 F.3d at 715–16.  For the following reasons, the Court concludes that Defendants had a legitimate expectation of privacy in the conversations recorded by the stationary microphones at the courthouse trustee sales and GRANTS the motion to suppress as set forth below.

### A.      Standing to Challenge the FBI's Electronic Surveillance Program

Under "federal law, any aggrieved person has standing to bring a motion to suppress the contents of intercepted wire or oral communications or evidence derived therefrom." See United States v. Oliva, 705 F.3d 390, 395 (9th Cir. 2012); Rakas v. Illinois, 439 U.S. 128 (1978).  A defendant need not "admit that the voices in the conversations intercepted included his own" to establish standing.  See Oliva, 705 F.3d at 395.  Rather, defendants "against whom the interceptions were directed" and who "were the target of the surveillance" have standing to contest that surveillance.  See id.; Alderman v. United States, 394 U.S. 165, 173 (1969) ("In order to qualify as a person aggrieved by an unlawful search and seizure one must [be] . . . one against whom the search was directed.").

The government admits that Defendants Giraudo, Grinsell, and Cullinane were among the initial targets of the FBI's electronic surveillance program, and the Court has already concluded that they have standing here.  See Feb. 11 Tr. at 12:5–21, 13:1–15, 15:19–20 (noting that Giraudo, Grinsell, and Cullinane are listed as "interceptees" on FBI surveillance forms); Oliva, 705 F.3d at 395.  Defendant Farag became a target of the FBI's electronic surveillance program on January 6, 2010, and thus has standing to challenge all recordings that were made after that date.  See Feb. 29 Tr. at 182:22–183:7, 185:14–17, 194:8–23; Def. Ex. 18; Def. Ex. 19; Oliva, 705 F.3d at 395.  Defendant Appenrodt became a target of the electronic surveillance on March 29, 2010—he similarly has standing to challenge all recordings made after that date.  See Feb. 29 Tr. at 196:19–22; Oliva, 705 F.3d at 395.

11

United States District Court
For the Northern District of California

**B.      Defendants' Expectation of Privacy at the Courthouse**

The Court next examines whether Defendants had a legitimate expectation of privacy in their conversations at the San Mateo County Courthouse.  "Guided by <u>Katz</u>, our inquiry is whether the communications overheard . . . were uttered by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable."  <u>See</u> <u>United States v. Freie</u>, 545 F.2d 1217, 1223 (9th Cir. 1976).  For the following reasons, the Court concludes that Defendants had a legitimate expectation of privacy in the conversations recorded by the FBI's stationary microphones at the trustee sales at issue here.  <u>See</u> <u>id.</u>

**1.      Subjective Expectation of Privacy**

Defendants may establish that they had a subjective expectation of privacy by stating that they actually believed their communications were private.  <u>See</u> <u>McIntyre</u>, 582 F.2d at 1223 ("There is no question that [defendant] had a subjective expectation of privacy . . . [he] testified that he believed that normal conversations in his office could not be overheard.").  Defendants Giraudo, Grinsell, Cullinane, and Appenrodt all submitted sworn declarations stating that they "believed and expected" their conversations at the trustee sales outside the courthouse "to be private, confidential conversations."  <u>See</u> Def. Exs. 66–69 ¶¶ 6–7.

Defendant Farag did not submit a sworn declaration—he declined to attend the relevant evidentiary hearing.  <u>See</u> Order Re Farag Decl. (dkt. 110).  Nevertheless, we may still "ask whether the individual, by his conduct, has exhibited an actual expectation of privacy."  <u>See</u> <u>Bond v. United States</u>, 529 U.S. 334, 338 (2000).  The parties here agreed that each Defendant would have testified that they took steps similar to those taken by Defendant Grinsell to protect the privacy of their conversations at the auctions.  <u>See</u> Apr. 5 Tr. at 88–89.  Thus, the record reflects that Farag would keep a close eye on the people near him, speak in a lower voice or stop talking when strangers approached, and generally do "everything possible to make sure nobody else heard [his] conversation[s]."  <u>See</u> April 5 Tr. at 40–52.  Video recordings confirm that Farag took these steps.  <u>See</u> Def. Ex. 53 (1D073.007 at 27:40); Def. Ex. 53 (1D048.003 at 7:50 &14:57).  The Court thus concludes Defendants had a

**United States District Court**
For the Northern District of California

subjective expectation of privacy in conversations recorded by stationary microphones at the auctions.

### 2.    Objectively Reasonable Expectation of Privacy

"Courts in this Circuit have looked to a number of factors to determine whether a reasonable person would possess an expectation of privacy in an oral conversation." See Reynolds v. City & Cty. of San Francisco, No. C 09-0301 RS, 2012 WL 1143830, at *5 (N.D. Cal. Mar. 30, 2012), aff'd, 576 F. App'x 698 (9th Cir. 2014). These factors include (1) "nature of the location where the conversation was seized," see United States v. Gonzalez, Inc., 412 F.3d 1102,1116 (9th Cir.2005) (holding that officers of company had a reasonable expectation of privacy in the small office over which they exercised full access); (2) whether the conversation could be overheard with the naked ear, Kemp v. Block, 607 F. Supp. 1262, 1263–64 (D. Nev. 1985); (3) whether the conversation took place out in the open, see Siripongs v. Calderon, 35 F.3d 1308, 1320 (9th Cir. 1994) (holding that a telephone conversation conducted in the middle of a police department was not protected); and (4) whether the conversation involved business or private matters, see Medical Lab. Mgmt. Consultants v. Am. Broad. Co., Inc., 306 F.3d 806, 814 (9th Cir.2002) (concluding that plaintiff's discussion of business rather than private affairs does not create a reasonable expectation of privacy in the conversation). See Reynolds, 2012 WL 1143830, at *5.

The parties also request that the Court to consider the factors set forth in Kee v. City of Rowlett, 247 F.3d 206, 213–15 (5th Cir. 2001), a case they present as a leading authority on this issue and one that has been cited approvingly by at least one Ninth Circuit judge. See Gonzalez v. Spencer, 336 F.3d 832, 836 (9th Cir. 2003) (Fletcher, J., dissenting). The Kee factors examine the volume of the conversation; the proximity or potential of other individuals to overhear the conversation; the potential for communications to be reported; the affirmative actions taken by the speakers to shield their privacy; the need for technological enhancements to hear the communications; and the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating. See Reynolds, 2012 WL 1143830, at *5.

13

1    For the following reasons, the Court concludes that both the factors collected in

2    Reynolds and the Kee factors indicate that Defendants had an objectively reasonable

3    expectation of privacy in the conversations recorded by the stationary microphones here.

### i.    Nature of Location Where Conversations Were Recorded

5    In determining whether Defendants "had a reasonable expectation of privacy over the

6    intercepted [conversations], it is important to assess the nature of the location where these

7    conversations were seized."  See United States v. Gonzalez, Inc., 412 F.3d 1102, 1116 (9th

8    Cir. 2005), amended on denial of reh'g, 437 F.3d 854 (9th Cir. 2006).  In Gonzalez, the

9    Ninth Circuit—affirming the suppression of wiretap evidence—concluded the conversations

10   at issue occurred in an area well-known to the defendants that typically contained only about

11   25 other persons, and thus defendants had a legitimate expectation of privacy.  Id. at

12   1116–17.  Here, only about six to sixteen people typically attended the trustee sales, and they

13   were largely a group of regular bidders.  April 5 Tr. at 31:21-32:4.  The location at issue here

14   thus supports a reasonable expectation of privacy.  See Gonzalez, 412 F.3d at 1116.

15   The government initially argued that Defendants could not have a reasonable

16   expectation in an outdoor area like the public auction site at the San Mateo County

17   Courthouse—the government has subsequently abandoned that position in the face of

18   opposing legal authority.  See Gov. Opp'n (dkt. 144) at 10 (admitting that "it is possible to

19   have a private conversation in a public place").  Numerous controlling cases indicate that a

20   defendant can have a reasonable expectation of privacy in a location accessible to the public.

21   See, e.g., Katz, 389 U.S. at 351–52 (defendant had a reasonable expectation of privacy in a

22   public telephone booth because he shut the door behind him); McIntyre, 582 F.2d at 1224

23   (police officer had a reasonable expectation of privacy in statements made in his office, even

24   though his office doors were open and a records clerk sat fifteen feet away); cf. Siripongs v.

25   Calderon, 35 F.3d 1308, 1320 (9th Cir. 1994).  Kee expressly acknowledges that "two federal

26

27

28

United States District Court
For the Northern District of California

14

United States District Court
For the Northern District of California

judges may have a reasonable expectation of privacy in a hushed conversation on the courthouse steps." See Kee, 247 F.3d at 215 n.18.[3]

### ii.   Volume of the Conversations and Whether They Could Be Overheard by Nearby Individuals

The volume of oral communications is relevant to whether the speaker has a reasonable expectation of privacy, as is the proximity or potential of other individuals to overhear the conversation. See Kee, 247 F.3d at 213–14; Reynolds, 2012 WL 1143830, at *5. The key inquiry here, however, "is not whether it is conceivable that someone could eavesdrop on a conversation but whether it is reasonable to expect privacy." See United States v. Smith, 978 F.2d 171, 179 (5th Cir. 1992) (citing Florida v. Riley, 488 U.S. 445, 453–54 (1989) (O'Connor, J., concurring)). The evidentiary record here confirms that Defendants did not speak at a volume loud enough for an undercover agent or an FBI cooperator to overhear them. Feb. 11 Tr. at 155:7–12 (reflecting that the lead FBI agent testified that "the key observation made in the early part of the case" was that the cooperator and undercover agent "could not hear" Defendants' conversations).

Turning to "proximity or potential" to be overheard, the extensive record here indicates that a passerby could not have overheard Defendants' private conversations. Trained undercover agents were unable to do so.[4] See Feb. 11 Tr. at 155:7–12. The government did not produce expert testimony on whether any of the bystanders who were identified in video surveillance near the stationary microphones could have overheard the sensitive conversations between Defendants that were recorded on those microphones. The Court repeatedly invited such expert testimony. See April 5 Tr. at 73:20–24 (calling for "a

---

[3] It is unknown whether the number of federal judges is a limiting factor.

[4] Given evidence that Defendants began keeping their conversations private, the Court asked the government to produce witnesses who had been able to overhear Defendants discussing bid-rigging after the falling out with the cooperator. See April 5 Tr. at 75:17–21 ("[B]ring in the witness who overheard. Bring in that person who said, I walked by this defendant, this gentleman. I walked by him, and you know what I heard him say? I heard him say 'we're fixing the price.'"); id. at 69:17–19 ("[I]f you have got some evidence out there that a stranger, a member of the public, overheard these conversations, bring it on."); id. at 90:9–11 ("[T]hat's exactly the sort of thing that I think you need. A member of the public who overheard these conversations."). The government declined an additional hearing and failed to produce such a witness. The Court finds no evidence indicating that FBI agents or members of the public overheard Defendants' private conversations during this time period.

technical person who would say, standing at this place, at this location, this number of feet from the microphone, this conversation could be overheard"); id. at 79:11–13 ("And you're asking me to conclude that these people who are walking by heard the conversation. There is no way I can do it without some scientific evidence.").

The Court thus finds no evidence in the record establishing that bystanders overheard the conversations surreptitiously recorded on the twenty-eight days in question; it does, however, find ample evidence in the record that bystanders could not overhear those conversations. See, e.g., Feb. 11 Tr. at 155:7–12**.** This factor thus supports a reasonable expectation of privacy. See Kee, 247 F.3d at 213; Reynolds, 2012 WL 1143830, at *5.

### iii.    Potential for Individuals to Report Conversations

Kee lists "[t]he potential for communications to be reported" as a factor relevant to determining whether an expectation of privacy is reasonable. See Kee, 247 F.3d at 214. This factor is of limited relevance here because the Supreme Court has recognized that the "risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society." See Hoffa v. United States, 385 U.S. 293, 302 (1966).

To the extent this factor applies here, the record establishes that Defendants largely restricted their conversations to their alleged co-conspirators, reducing the likelihood that their conduct would be reported—although obviously not eliminating that risk. See April 5 Tr. at 40–52 (noting Grinsell's testimony that he would keep a close eye on the people near him, speak in a lower voice or stop talking when strangers approached, and generally do "everything possible to make sure nobody else heard [his] conversation[s]"). The Court thus finds that this factor supports a reasonable expectation of privacy. See Kee, 247 F.3d at 214.

### iv.    Whether the Conversations Involved Private Affairs

The Ninth Circuit has noted that "the covert videotaping of a business conversation among strangers in business offices does not rise to the level of an exceptional prying into another's private affairs." See Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc., 306 F.3d 806, 819 (9th Cir. 2002). Again, this factor is of limited relevance—Defendants do

16

1    not challenge the video surveillance collected by the FBI.  To the extent <u>Med. Lab. Mgmt.</u>

2    <u>Consultants</u> is relevant, the Court notes that the FBI did not record conversations between

3    strangers here; the trustee sales were typically attended by a group of regular bidders and

4    alleged co-conspirators.  <u>See</u> April 5 Tr. at 31:21-32:4; <u>cf.</u> 306 F.3d at 819.

**v.    Affirmative Steps Taken to Protect Privacy**

6    Finally, <u>Kee</u> stresses the importance of "the affirmative actions taken by the speakers

7    to shield their privacy."  <u>See Kee</u>, 247 F.3d at 214.  The Court has developed an extensive

8    record on this factor and concludes that it supports a reasonable expectation of privacy.

9    As stated above, Defendants' relationship with the FBI's cooperator "soured" directly

10   prior to the FBI's implementation of the electronic surveillance program disputed here.  <u>See</u>

11   Feb. 11 Tr. at 56:16-23.  An agent stated that it became "typical behavior" for Defendants

12   and the alleged co-conspirators to hold conversations "separate[ly] from [the] informant and

13   from [the] undercover agent."  <u>Id.</u> at 145:16–146:5, 148:11–25, 153:2–11.  The lead FBI

14   agent said "the key observation made in the early part of the case" was that the cooperator

15   and undercover agent "could not hear" Defendants' conversations.  <u>Id.</u> at 155:7–12**.**

16   The record indicates that Defendants would "routinely would walk away from a larger

17   group, stand close to the individuals with whom [they] [were] speaking, cease conversations

18   when others approached, try to speak out of earshot of other people, or speak quietly or

19   whisper."  Def. Exs. 66-69 ¶ 7.  The lead FBI investigator described Defendants as "talking

20   among themselves," "talking together," and "separately speak[ing]" around this time period.

21   <u>See</u> Def. Ex. 9 (12:34 pm; 1:07 pm; 1:16 pm).  Defendants and other alleged co-conspirators

22   whispered in each other's ears during numerous conversations.  <u>See</u> Def. Ex. 9 (1:59 pm;

23   12:23 pm – 13:10 pm).  They would also break off into small groups to confer.  <u>See</u> Def. Ex.

24   41 (12:59 pm); Def. Ex. 42 (12:34 pm; 13:05 pm).  Defendant Grinsell, for example, testified

25   that he would keep a close eye on the people near him, speak in a lower voice or stop talking

26   when strangers approached, and generally do "everything possible to make sure nobody else

27   heard [his] conversation[s]."  <u>See</u> April 5 Tr. at 40–52.

28

**United States District Court**
For the Northern District of California

1    Grinsell explained Defendants' behavior, testifying that it was critical for bidders to

2    shield certain sensitive conversations from eavesdroppers at the auctions because bidders

3    were surrounded by competitors. <u>See</u> April 5 Tr. at 40:14–20 ("There were private

4    conversations going on while the auctions were being conducted."). If a bidder "talked

5    openly about what they were going to bid, the condition of the property or anything else, it

6    would work contrary to their interests in getting the property." <u>Id.</u> at 43:19–44:1. It was thus

7    "difficult" and "rare" to overhear another bidder's conversation. <u>Id.</u> at 43:12–25.

8    Given this evidence that Defendants began keeping their conversations private, the

9    Court asked the government to produce witnesses who had been able to overhear Defendants

10   discussing bid-rigging after the falling out with the cooperator. The government declined to

11   call any such witnesses. The Court thus concludes that Defendants took extensive,

12   successful steps to protect their privacy, and this factor weighs heavily in favor of a

13   reasonable expectation of privacy. <u>See</u> <u>Kee</u>, 247 F.3d at 214.

14   **IV.    CONCLUSION**

15   With continuing advances in technology, private conversations may become

16   anachronistic rituals reducing intimate encounters to silent exchanges of notes. But that day

17   has not arrived. Until it does, our Fourth Amendment protections should be defined by

18   traditional circumstances. The Court concludes that Defendants had (1) a subjective

19   expectation of privacy in the conversations recorded by the stationary microphones at the San

20   Mateo County Courthouse, and (2) that expectation was objectively reasonable.[5] The Court

21   thus GRANTS the motion to suppress all stationary recordings to the extent permitted under

22   the standing analysis set forth above.

23   //

24   //

25   //

26

27   _____

28   [5] The Court notes that a contrary conclusion was reached in <u>United States v. Alvin Florida</u>, No. 14-cr-582-PJH-1 and <u>United States v. Marr, et al.</u>, No. 14-580-PJH. While the legal analysis in those related cases and the one before the Court is similar, the facts developed in the record are not.

1        The Court SETS a status conference regarding a subsequent taint hearing for August

2    10, 2016.

3        **IT SO ORDERED.**

4

5    Dated: August 1, 2016

                             CHARLES  R. BREYER

6                                 UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California