LATHAM & WATKINS LLP
 Daniel M. Wall (Bar No. 102580)
  dan.wall@lw.com
 Ashley M. Bauer (Bar No. 231626)
  ashley.bauer@lw.com
 Colleen E. Heyler (Bar No. 313036)
  colleen.heyler@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

*Attorneys for Defendant Abraham S. Farag*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 14-00534 CRB |
| Plaintiff, | **DEFENDANT ABRAHAM FARAG'S SENTENCING MEMORANDUM** |
| v. | Hon. Charles R. Breyer |
| JOSEPH J. GIRAUDO, RAYMOND A. GRINSELL, KEVIN B. CULLINANE, JAMES F. APPENRODT, and ABRAHAM S. FARAG, | Courtroom 6, 17th Floor<br>Date:  April 26, 2018<br>Time: 1:30 pm |
| Defendants. | |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT ................................................................................ 1

II.   BACKGROUND .............................................................................................. 3

    A.    Mr. Farag Overcame a Difficult Childhood to Attend MIT and
            Stanford and Design Products at Apple. ................................................... 3

    B.    Mr. Farag Is a Devoted Husband, Father, Friend, and Member of
            the Local Community. ............................................................................. 4

    C.    Mr. Farag Turned to Real Estate Investing Because It Allowed
            Him to Spend More Time with His Family. .............................................. 8

    D.    Mr. Farag's Interactions with the Big Five. ............................................ 10

    E.    Mr. Farag Deeply Regrets His Participation in the Conspiracy and
            Has Devoted Himself to Charitable Efforts and Raising His
            Children.............................................................................................. 12

III.  THE SENTENCING FACTORS WARRANT A SENTENCE WELL
BELOW THE ADVISORY GUIDELINES RANGE. ................................................. 15

    A.    Mr. Farag's Participation in the Conspiracy Was a Serious Lapse
            in Judgment in an Otherwise Exemplary Life. ....................................... 16

    B.    Similarly Situated Defendants Have Been Sentenced to Probation.................... 18

    C.    A Sentence of Probation, a $20,000 Fine, and $7,000 Restitution Is
            Sufficient But Not Greater than Necessary............................................ 21

IV.   MR. FARAG PROVIDED SUBSTANTIAL ASSISTANCE TO THE
GOVERNMENT............................................................................................. 24

V.    CONCLUSION............................................................................................. 26

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### CASES

4

*Gall v. U.S.,*
    552 U.S. 38 (2007)..................................................................................................24

5

6

*Nelson v. United States,*
    555 U.S. 350 (2009)................................................................................................15

7

8

*U.S. v. Knights,*
    534 U.S. 112 (2001)................................................................................................24

9

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...................................................................17

10

11

*United States v. Beamon,*
    373 F. Supp. 2d 878 (E.D. Wis. 2005)..................................................................17

12

13

*United States v. Booker,*
    543 U.S. 220 (2005)................................................................................................15

14

*United States v. Brian McKinzie,*
    No. 4:11-cr-00424-PJH, ECF No. 100 (Sept. 27, 2017)........................................21

15

16

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) (en banc) ................................................................15

17

18

*United States v. Cooper,*
    394 F.3d 172 (3d Cir. 2005)...................................................................................17

19

*United States v. Cox,*
    271 F. Supp. 3d 1085 (S.D. Iowa 2017) ...............................................................22

20

21

*United States v. Gernot Sebastian Zepernick,*
    No. 4:14-cr-00512-PJH, ECF No. 33 (Aug. 7, 2017).............................................20

22

23

*United States v. John Michael Galloway,*
    No. 4:14-cr-00607-PJH, ECF No. 277 (Mar. 8, 2017)....................................21, 25

24

*United States v. Joseph Giraudo, et al.,*
    Case No. 3:14-cr-0534-CRB, ECF No. 102 (Mar. 7, 2016) .............................1, 10

25

26

*United States v. Lehmann,*
    513 F.3d 805 (8th Cir. 2008) .................................................................................22

27

*United States v. Leslie Gee,*
    No. 4:14-cr-00003-PJH, ECF No. 40 (Aug. 9, 2017).............................................21

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

*United States v. Nicholas Diaz,*
No. 4:15-cr-00607-PJH, ECF No. 272 (Mar. 1, 2017) ............................................21

*United States v. Ramin Rad "Ray" Yeganeh,*
No. 4:15-cr-00339-PJH, ECF No. 101 (Mar. 1, 2017) ............................................21

*United States v. Rudolph Silva,*
No. 4:14-cr-00002-PJH, ECF No. 46 (Aug. 7, 2017) ..............................................20

*United States v. Stephan Florida,*
No. 4:14-cr-00582-PJH, ECF No. 408 (Jan. 4, 2017) ......................................21, 26

**STATUTES**

18 U.S.C. § 3553(a) ...........................................................................................2, 15, 16

U.S.S.G. Ch. 5, Pt. A ...............................................................................................15

U.S.S.G. § 2R1.1, cmt. 5 & ......................................................................................21

U.S.S.G. § 3B1.1 .......................................................................................................24

U.S.S.G. § 5B1.1 .......................................................................................................21

U.S.S.G. § 5E1.1(a) ...................................................................................................15

U.S.S.G. § 5K1.1 ............................................................................................... *passim*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

# I.     SUMMARY OF ARGUMENT

Abraham Farag is familiar to this Court because he is the sole person who was indicted and participated in the suppression and taint hearings, yet was not an integral member of the "Big Five", the core group of men who organized and facilitated the bid-rigging scheme at San Mateo trustee auctions.  To the contrary, during those hearings FBI Special Agent Roan Wynar testified that Abraham was someone who came to auctions to buy property, was confronted by members of the Big Five (as was their practice with new and unfamiliar bidders) and in Special Agent Wynar's words was engulfed by the existing "corruption."  *See* Tr. of Feb. 29, 2016 Hr'g at 186:7-14, *United States v. Joseph Giraudo, et al.*, Case No. 3:14-cr-0534-CRB, ECF No. 102 (Mar. 7, 2016) ("Feb. 26, 2016 Hr'g Tr.") (the Big Five would "reach out to people who would come to the auction, and some number of those people would end up becoming corrupted or become part of the illegal behavior").

Abraham stands before the Court because he failed to cope with that corruption properly.  In retrospect, he should have avoided the auctions or, better yet, called the authorities.  Instead, he tried to limit his involvement with the Big Five while continuing to buy properties.  Abraham succeeded to a degree, as is evident in the modest list of properties underlying the Government's volume of commerce calculations.  *See* Ex. 25 (table showing Government's properties list for Abraham).  But the fact is that Abraham, like many others, did not escape the corruption.  Abraham accepts full responsibility for his actions, and more generally his role in the San Mateo County bid-rigging scheme.

Nevertheless, Abraham Farag is a good man who has otherwise lived an exemplary and commendable life.  His mistakes in coping with the conditions at the San Mateo County trustee auctions do not define him.

The nineteen letters submitted to the Court on behalf of, and in support of, Abraham describe an exemplary citizen.  We choose those words carefully, notwithstanding the present circumstances, because the fact is that Abraham puts most of us to shame in terms of his dedication to his family, friends, and the communities around him.  Abraham overcame a challenging upbringing—a transient childhood marred by physical abuse and conflict at home—

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

to become a dedicated husband, father, colleague, and community leader.  He attended MIT and Stanford, then settled in the Palo Alto area to work as an engineer and start a family.  He has three children and is an integral part of their daily lives; indeed, he is their primary caregiver. Abraham prioritizes family above all else, continuously providing financial and emotional support for his father, mother, step-mother, and brothers.  But what sets him apart is his extraordinary dedication to the communities around him.

Abraham improves the lives of others.  He has immersed himself in the greater Palo Alto community, serving on the board of his children's school, creating youth mentorship programs, and always being the person who will jump in to help with a community initiative without a second thought.  He creates non-profit organizations that, drawing on his engineering skills, provide electricity to rural communities in underdeveloped countries.  He created a solar-powered lamp that is given away to those in need and sold to others, all of the profits from which he donates to non-profit organizations.  He created another non-profit for distributing technology that teaches children to play musical instruments.  He provides housing for clean and sober living facilities in East Palo Alto—opening housing to the same individuals in need who are regularly referred by sentencing courts like this Court.  These are the actions of a man who is warm, compassionate, and opens his heart and home to those in need.  The letters before the Court describe an honest and hardworking man, one whose crime came as a shock to those who know him best.  Those people still love Abraham, support him, and trust him because this crime does not represent the character of the man they have come to know.

The Court must now determine a fair sentence for Abraham—a punishment "sufficient, but not greater than necessary" to accomplish the goals of criminal punishment.  18 U.S.C. § 3553(a).  In Abraham's case, that sentence should consist of a fine and restitution in the amounts set forth below, and probation.  The Government, per an inviolate Antitrust Division policy to always seek jail time for antitrust offenders, asks for Abraham to be incarcerated.  Yet *none* of the  other pleading defendants in the Bay Area-wide real estate bid-rigging cases who, like Abraham, have an offense level of 11 and a Section 5K1.1 reduction for substantial assistance to the Government, has been sentenced to prison.  In fact, no one with the higher offense level of 13

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

and a Section 5K1.1 reduction has been sentenced to prison either.  A sentence of a fine, restitution, and probation for Abraham is therefore justified simply to avoid disparate sentences between defendants.

But that's not the half of it.  Everyone agrees that Abraham (and others, to be sure) faced an auction process that had been thoroughly controlled and corrupted by others.  He was never an initiator or proponent of the unlawful behavior; he was, rather, compromised by it.  That is serious, and Abraham makes no excuses.  But justice in this case must include some measure of understanding that the conditions created by the Big Five could lead good people to make bad choices.  Abraham is a very good person whose incarceration would serve no good purpose.  A fine, restitution and probation will be more than sufficient.

## II.    BACKGROUND

### A.    Mr. Farag Overcame a Difficult Childhood to Attend MIT and Stanford and Design Products at Apple.

Abraham Farag was born on September 9, 1972 in Columbia, Missouri.  Presentence Report ("PSR") ¶ 44.  His father worked as a chemist, and his mother was a homemaker.  PSR ¶ 44.  Abraham made the best of a difficult childhood.  His father physically abused Abraham, his three brothers, and their mother, and Abraham ran away twice as a teenager to escape the abuse.  PSR ¶ 46.  The family moved over a dozen times before Abraham graduated high school, which made it difficult to make and maintain adolescent friendships.  PSR ¶ 49; Ex. 1 ████ ████████████.  Nonetheless, Abraham's warmth, charisma, and optimism shined through, and he was voted most friendly in his senior class.  *See* PSR ¶ 48.

In high school, Abraham was a member of the math team and physics club, PSR ¶ 47, and he decided he wanted to study engineering.  Abraham attended MIT from 1990 to 1994, where he met lifelong friends and developed a passion for problem-solving through design.  At MIT, Abraham was "a leader, someone you could turn to in times of need"; he was "always helping out with a positive attitude," including tutoring younger students and organizing trips for the dorm.  Ex. 16 ████████████████.  Even as a college student, Abraham "wanted to help the world," so he joined MIT's solar electric car team and took the cars around the world to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1    showcase what they could do.  Ex. 9 █████████████████; Ex. 4 ████████

2    ████████.

3         After college, Abraham spent two years working at General Motors, where his team built

4    3,000 electric vehicles.  Ex. 9 ██████████████████.  He left General Motors to get his

5    Master's in Product Design from Stanford and, upon graduation, began working at Apple.

6    Abraham was part of a team that developed the Apple Pro mouse, "an intense project with a

7    small team pushing the limits on what could be done in design, engineering, and the process of

8    molding plastic."  Ex. 2 ██████████████.  Colleagues "found Abraham's approach to

9    design refreshing and unique" and admired his "collaborative spirit," "warm and caring

10   personality," and ability to foster the talents of others, "creating a safe and productive

11   environment for ideas to be nurtured and thrive."  *Id.*; Ex. 15 ███████████████.

12   Apple was "a highly competitive, often brutal business" at the time, and while some employees

13   "adopted a highly adversarial" attitude, Abraham brought "honest cooperation," "creative

14   problem solving," and "professional respect" to his teams.  Ex. 15 ███████████████.

15        In 2005, after six years at Apple, Abraham founded his own firm, Sparkfactor Design.

16   PSR ¶ 64.  Abraham is passionate about industrial design, and many of his colleagues use

17   products he developed.  Ex. 5 ███████████████.  Friends describe him as one of the

18   brightest and most talented engineers they know, but also one of the kindest and most humble.

19   Ex. 11 ████████████████.  Abraham is motivated not by money but "by building and

20   supporting community," "by fostering creativity," and "by gaining personal growth in himself

21   and others."  Ex. 13 ██████████████.  "Abraham's roots are humble and unlike many

22   successful entrepreneurs[,] he has chosen a modest lifestyle," focusing on "friends, family[,] and

23   the community where he has been quick to offer support with his time, talent[,] and funding."

24   Ex. 17 ████████████████.

25        **B.    Mr. Farag Is a Devoted Husband, Father, Friend, and Member of the Local
              Community.**

26

27        Abraham met Claudia Truesdell at Stanford while they were both studying engineering,

28   and they married in 2001.  Ex. 9 ████████████████.  They live in Palo Alto with

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   their three children:  Fiona (15), Otto (13), and Niles (11).  The family enjoys riding bikes,

2   visiting parks and museums, camping, and exploring the coast.

3          Family is the most important thing in Abraham's life.  "His connection to and care for

4   [his] kids is powerful and absolute."  Ex. 9 ███████████████████.  As a family friend

5   of twenty years described, "The first thing that comes to my mind when I think of Abe is that

6   after dinner he plays games with his children instead of watching television. . . . [He] engages

7   with his children.  He educates them.  He is loving and caring.  He is patient and encouraging.

8   He asks questions and listens to the answers."  Ex. 11 ████████████████.  This

9   sentiment is universal in the letters submitted on Abraham's behalf:

- "Watching his relationship with his kids is a joy, always helpful, engaged and playful.
  I have watched him instruct them, never overly critical, always patient and loving
  first, easy to be around; so different from how I have experienced many parents
  interacting with their kids."  Ex. 15 ████████████████.

- "It is because of him that our tough athletic daughter [Fiona] gleefully takes on new
  physical challenges.  He will enthusiastically try out a new sport with her, most
  recently rock climbing. . . . Our boys [Otto and Niles] crave complex logic games on
  screen and off. . . . Abraham loves playing these games with them.  Our kids start
  their day with their dad who wakes before them to make their breakfast and pack their
  school lunches.  They end their day with their dad reading stories to them and tucking
  them in . . . None of us can imagine our life without him."  Ex. 9 ████████████
  ███████.

- "He is a loving father who is deeply involved in the daily lives of his three children –
  Fiona, Niles and Otto.  I have seen over the years the supportive and critical role he
  plays in their personal and school lives."  Ex. 12 ████████████████.

- "Abraham is an incredible father and husband.  I'm always amazed at the quality of
  his family relationships and the care he gives.  [A recent dinner with the Farag
  family] reinforced my previous observations of the love, encouragement, and
  education he provides to his children and to those around him.  Given his high degree
  of involvement, it is difficult to imagine life in his family without his presence."
  Ex. 4 ████████████████.

- Abraham is "a family man first; he and his wife Claudia have 3 beautiful children that
  he loves spending time with.  They are both very involved with their children.  I have
  witnessed him reschedule a morning of meetings to go on one of his kids' field trips
  on more than one occasion, or push out a meeting if they stop by the office to see
  him.  He takes the time to listen to their day with true interest, and it's evident that
  they adore him."  Ex. 3 ████████████████.

- "I have known [Abraham's] partner Claudia just as long [as I have known Abraham],

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

and I cherish them both, and their wonderful, bright, happy kids I have seen grow from babies. They both take being parents seriously and put a lot of love into raising the kids." Ex. 13 █████████████████.

- "Abraham is a loving and patient father to his children aged 11, 13, and 15. He has provided them a stable upbringing, living in the same three mile radius for the last twenty years. . . . He takes great pride in helping his kids explore the world," including trips to a cabin in the Oregon woods, as well as to Cuba and Tanzania to visit non-profits he supports. Ex. 1 █████████████████.

In addition to providing emotional support for his children, Abraham has provided emotional support for his extended family. In particular, when Abraham's brother Zane died in 2014 and when his mother died in 2016, Abraham was a source of comfort to his extended family. *See* PSR ¶¶ 44, 49; Ex. 1 ███████████████; Ex. 9 ███████████████.

In addition to emotional support, Abraham "has always been the financial anchor to [his] family," even before he was financially stable himself. Ex. 6 ███████████; Ex. 7 ████████████████████. Indeed, the family has "to fight with [Abraham] not to give too much." Ex. 7 █████████████. Shortly after Abraham started college, his mother left his father due to physical abuse. PSR ¶ 46. Having never worked outside the home, Abraham's mother had little chance of obtaining a well-paying job. PSR ¶ 49. For more than twenty years, beginning in 1994 when Abraham graduated from MIT and until her death from breast cancer in 2016, Abraham sent his mother monthly checks, which were the majority of her income for the last decade of her life. Ex. 1 ███████████████; PSR ¶¶ 44, 49. Abraham purchased his mother a home in 2002 and, when he could afford it, a nicer home in 2006.

Abraham also supports his brother Aladdin (age 45), who █████████████████ ████████████████████████. Ex. 1 █████████████████. Since 2004, when Abraham learned that ████████████████ Abraham has been sending Aladdin monthly checks and also bought him a new car. *Id.*; PSR ¶ 49. Aladdin does not know what he would do without Abraham's support. Ex. 1 ████████████████. Abraham also supports his father despite enduring years of physical abuse. "The home environment for Abraham growing up was difficult. His treatment from [his father] was often bad and at times cruel, but since his adulthood Abraham has stepped in to help [his father and stepmother] without

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   a second thought." Ex. 7 ███████████████. Abraham's father developed early stage

2   dementia and was forced into retirement in 2002 without enough savings to support his wife

3   (Abraham's stepmother) and two young sons (Abraham's half-brothers). In 2004, Abraham

4   began sending his father and stepmother monthly checks, which have constituted about half of

5   their monthly cash flow for the past ten years. Abraham's half-brother Omar (age 23) was not

6   planning to apply to college because he thought his parents could not afford it, but Abraham

7   encouraged Omar to apply and paid his tuition at the University of Illinois when Omar enrolled

8   in 2013. Abraham's half-brother Amear (age 18) similarly was not planning to apply to college,

9   but Abraham has convinced him to apply and told him he will cover the tuition. "It speaks to his

10  character that Abraham has not only forgiven his father[,] but he has provided his father and

11  [stepmother] a livelihood, and helped provide his young step[-]brothers access to a better

12  childhood than he had." Ex. 7 ████████████. Abraham's support extends to his

13  wife's family as well; when he learned that his father-in-law was having trouble paying bills,

14  Abraham sent him money each month until he passed away in 2015. Ex. 9 ███████████

15  ██████.

16      Abraham is also a loyal and generous friend, "giving freely of his time and talents to help

17  those around him." Ex. 2 ████████████. When a college friend ███████████

18  ████████████████████████, Abraham responded immediately by buying him a plane ticket

19  to California. Ex. 16 █████████████. The friend lived with Abraham on and off

20  over the next two years, during which time Abraham helped him find work at Apple and

21  encouraged him to apply to a graduate program at MIT. *Id.* The friend, who still visits the Farag

22  family for a few weeks every year, explains, "I can honestly say that Abraham is one of the most

23  generous, caring, and community minded people I know, and that ████████████████

24  ████████████████████████████." *Id.* Abraham has opened his home

25  to relatives and others struggling to find their way, including taking on the adolescent son of a

26  family friend, "[giving] him a meaningful job, coach[ing] and nurtur[ing] him, virtually

27  adopt[ing] him, for years." Ex. 15 ███████████████. Abraham also is generous with

28  his design knowledge and business expertise, having provided career advice, acted as a sounding

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1  board for ideas, offered to back friends' companies, rented space to friends, and let friends'

2  employees stay in his home.  Ex. 13 ███████████████ ; Ex. 8 ███████████████ .

3  Friends describe Abraham as "a naturally generous person" who embodies "enthusiasm,

4  equality, creativity, and positivity."  Ex. 15 ███████████████ ; Ex. 8 ███████████

5  ███ .

6          Abraham is a pillar of the Palo Alto community.  He opened his home to more than sixty

7  families in his daughter's kindergarten class, which was the start of family friendships that have

8  lasted more than a decade.  Ex. 10 ██████████████ ; Ex. 5 ███████████████ .

9  A fellow parent describes Abraham as a "central character organizing a variety of family-

10  friendly activities outside of school," valued for his community spirit and positive influence.

11  Ex. 5 ██████████████ .  On the various camping trips he organizes, Abraham

12  "dive[s] into the middle of making group life successful; helping make and break camps,

13  arranging kid's hikes, motivating campfire activities and generally setting the tone for health[y]

14  lifestyles for all ages."  *Id.*  "[H]is outgoing friendliness and warmth [are] truly authentic."

15  Ex. 10 ██████████████ .  Abraham also supports his children's schools financially,

16  managing and funding the renovation of the Learning Center, where his children attended

17  preschool, and hosting numerous fundraising events.  PSR ¶ 51.  Consistent with his love for

18  community building and the outdoors, Abraham has worked tirelessly since 2010 to turn the

19  closed Cemex plant and its 9,000 acres in Davenport, California "into a gathering place the local

20  community and visitors from around the world could enjoy."  Ex. 17 ██████████████

21  ██████ .  Due in large part to Abraham's work with—and funding for—local development

22  planners, project managers, and environmental cleanup specialists, the Cemex land may be

23  preserved, rehabilitated, and turned into a national park site.  *Id.*  "The [Cemex plant] effort was

24  well beyond kicking the tires and an example of Abraham's commitment to the pursuit of a

25  better world."  *Id.*

26          **C.     Mr. Farag Turned to Real Estate Investing Because It Allowed Him to Spend
            More Time with His Family.**

27

28  Abraham began investing in real estate around 2000.  Ex. 20 (NDRE-FBI-I-002975) at -

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

2977.  His job at Apple was stressful and required significant travel time away from his family.  *Id.*  He began reading books on real estate investing and concluded that buying and leasing property would allow him to support his family without the time and travel commitments of working in the technology industry.  Between 2000 and 2005, Abraham purchased approximately one rental property per year on the multiple listing service (MLS).  *Id.*  In 2005, Abraham formed Working Dirt LLC to provide asset and privacy protection, and he continued to purchase rental properties on the MLS, primarily in the East Palo Alto neighborhood where he lived.  *See id.*

Abraham began attending trustee auctions in 2009 because he was a lender on a property that was being sold.  On a visit in mid-2009 to observe the bidding, he noticed two men who he would later learn were two members of the Big Five:  Dan Rosenbledt and Mo Rezaian.  *Id.*  Abraham briefly interacted with Rosenbledt and Rezaian, asking them why no one bid on a property that Abraham owned.  *Id.*  Rosenbledt explained that the property had cracks and drainage problems and was near a bad neighborhood, which would make it difficult to sell.  *Id.*

Abraham returned to the trustee auction in late summer or early fall of 2009, intending to buy more properties as a business.  *Id.*  During this time, Rezaian and Defendant Joseph Giraudo approached him and asked what he was doing at the auction and what kind of properties he was interested in.  Abraham explained that he was looking to buy properties in East Palo Alto to hold as rentals, and that he had limited capital.  In late 2009, Abraham purchased two properties at the auction with a combination of his own money and money from friends.  The Government does not claim there was any unlawful conduct in connection with those purchases.

In early 2010, Abraham decided that purchasing properties at auction was a worthwhile investment and decided to ask others to invest in Working Dirt.  He shifted Working Dirt's business model to bring in friends as investors, each of whom would have an ownership interest in the company.  Ex. 20 (NDRE-FBI-I-002975) at -2977.  Investors would receive 70% of the profits, and Working Dirt would take 30% as a management fee.  *Id.*  In early 2010, Abraham received an initial investment of $500,000.  Throughout 2010, Abraham and his wife Claudia owned approximately 24% of Working Dirt, while investors owned the remaining 76%.  During

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

2010—the period in which Abraham was charged with conspiracy—Working Dirt's 30%
management fee did not cover the actual costs of managing the properties and Abraham
personally did not profit from the business.

### D.     Mr. Farag's Interactions with the Big Five.

When he began regularly attending the auctions in 2010, Abraham quickly learned that a
core group of five persons ("the Big Five") controlled the auctions:  Giraudo, Rosenbledt,
Rezaian, Kevin Cullinane, and Ray Grinsell.  It seemed to Abraham that "the Big Five had
enough capital to buy every property sold at the auctions," and if someone did not play by their
rules, the Big Five would bid up every property that person wanted to buy.  Ex. 20 (NDRE-FBI-
I-002975) at -2983.  Giraudo was referred to as the "King," and Rezaian "controlled and
manipulated the auctions by intimidation, threats, and bribes."  Ex. 21 (NDRE-FBI-I-000241) at
-241.  The corruption Special Agent Wynar described in his testimony during the suppression
hearing emanated from the Big Five.  *See* Tr. of Feb. 11, 2016 Hr'g at 157:4-9, *United States v.
Joseph Giraudo, et al.*, Case No. 3:14-cr-0534-CRB, ECF No. 94 (Feb. 24, 2016) ("Feb. 11,
2016 Hr'g Tr."); Feb. 29, 2016 Hr'g Tr. at 186:7-14.  Its members would approach individuals
who qualified to bid and ask, "How much do you want to step aside?"  Feb. 29, 2016 Hr'g Tr. at
187:7-12.  According to an FBI 302 report, "Most people who were serious about buying and
flipping property sold at trustee sales eventually agreed to participate in payoff agreements."
Ex. 24 (NDRE-FBI-I-002248) at -2252.

The Big Five largely left Abraham alone at first because they were not interested in the
East Palo Alto properties that Abraham wanted to buy, and because Abraham was looking for
properties to rent rather than flip.  *See* Ex. 23 (NDRE-FBI-I-001804) at -1813.  Even when
Abraham purchased outside of East Palo Alto, the Big Five knew he had limited capital and did
not see him as a threat.  But the Big Five soon realized that "the prices in East Palo Alto were
favorable," *id.*, and that Abraham was seeking and obtaining more funding for the investment
vehicle Working Dirt.  So in early 2010 the Big Five began taking Abraham more seriously.
They approached him again and said they should "partner" together.  Abraham would not

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1    disagree with those who have described similar approaches as "a form of extortion or collective

2    agreement in which a payoff had to be made in order to purchase a property."[1]

3        Abraham understood and did not like what the Big Five were doing, but he nonetheless

4    agreed to "partner" with them on certain properties.  The Government does not contend, and

5    Abraham would dispute, that all of his activities at the auction were affected by the corruption.

6    For example, the list of properties the Government is using to calculate Abraham's volume of

7    commerce shows a six-month gap (between March and September 2010) in Abraham's unlawful

8    behavior.  *See* Ex. 25 (table).  Nevertheless, Abraham accepts that on a number of these

9    occasions he crossed the line and made inappropriate agreements with the Big Five. *Id.*

10        That said, Abraham was always an outsider, playing by the Big Five's rules in order to

11    avoid being bid up out of spite.  Abraham did not have agency to facilitate agreements on his

12    own.  In fact, on a number of occasions Abraham was simply told he owed someone money,

13    whether for an illegal payoff or a legitimate joint venture buyout, even when he had no idea what

14    deal had been struck or with whom, and even when he did not attend the auction at all.  For

15    example, prior to an auction, Abraham agreed to partner in a joint venture with Rezaian and

16    Cullinane on a property at 1719 Sweetwood.  Ex. 20 (NDRE-FBI-I-002975) at -2982.  After

17    Abraham bid for and won the property, Rezaian and Cullinane informed him that a different

18    bidder whom he did not know named Victor Dong was also in the partnership, and that Abraham

19    and Victor needed to pay out Rezaian and Cullinane for their percentages.  *Id.* at -2982-83.  That

20    is how the Big Five worked.

21        Despite Abraham's poor judgment in getting involved with the Big Five, his real estate

22    business had a positive effect on the community.  "[T]he work Abe did to improve so many

23    properties [at a time of great turmoil] was hugely impactful."  Ex. 10 ███████████████.

24

---

25    [1] *See* Ex. 22 (NDRE-FBI-I-001656) at -1661; *see also, e.g.*, Ex. 24 (NDRE-FBI-I-002248) at -2251-52 ("Giraudo made it clear . . . that in order for [people] to purchase property [at trustee

26    sales] they would have to [participate in payoff agreements] to stop the bidding. . . . If they did not agree then Giraudo would bid up the property to a price where the property was no longer

27    profitable."); Ex. 21 (NDRE-FBI-I-000241) at -242-43 ("[I]f you did not work with Giraudo or Rezaian in that way, you would be black balled. . . . The Group said, 'If you're not in, we'll just

28    bid you up.'").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

Abraham "purchased many run-down, unlivable houses, fix[ed] them up, and sold them to hard

working families who needed a nice affordable place to live." *Id.* He worked with numerous

tenants and prior homeowners to clean up their credit toward the goal of buying or buying back

their homes. Ex. 3 ████████████████. Abraham designed a lease-to-own program and

personally provided the financing that allowed some tenants to purchase their homes, often at

below-market prices. *Id.*; Ex. 19 ██████████████████████. "Many of these tenants

would not have thought home ownership possible without [Abraham's] support and guidance."

Ex. 3 ████████████. Abraham also donated properties to non-profits, helping them

manage the properties until the non-profits were able to sell them and use the proceeds to further

their missions. *Id.* Working Dirt's employees find their work "extremely gratifying" due in

large part to "Abraham's goal to live a life of giving." *Id.*; *see also* Ex. 19 ██████████

████████. They describe Abraham as "an individual of good will, benevolence, and human

kindness," Ex. 3 ██████████████, who "takes pride in helping others and lovingly

pushes those around him to be the best they can be and achieve their goals and dreams." Ex. 19

██████████████████.

### E. Mr. Farag Deeply Regrets His Participation in the Conspiracy and Has Devoted Himself to Charitable Efforts and Raising His Children.

Abraham is extremely regretful of his participation in the conspiracy. PSR ¶ 24; *see, e.g.*,

Ex. 12 ██████████████; Ex. 1 ██████████████; Ex. 4 ██████████

██████; Ex 7 ████████████████. As a result of his mistakes, his children have

dealt with the anxiety of losing their father and the embarrassment of being asked about his

crime, employees of Sparkfactor and Working Dirt fear for their jobs, and his investors and

business partners have suffered from his inability to refinance, obtain loans, and sign new

tenants. Over the past seven years, Abraham has spent "hundreds of hours in self[-]reflection,

and honest[,] searching conversations with friends, co-workers, and family." Ex. 9 ██████

██████. Abraham "knows that he made mistakes and took the wrong path," *Id.*, and

"[h]e now understands and deeply regrets the error of his business practices." Ex. 12

████████████.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

Indeed, "[t]his case has transformed Abraham's understanding of what matters in life and he is now determined to use his design and business skills to help others[.]" Ex. 12 ████████ ████████. Abraham "has always been motivated to help people, form communities[,] and socially contribute," Ex. 5 ████████████████, but his "[o]ngoing soul[-]searching caused him to double down on his efforts to be a good person in the world," Ex. 9 ████████. Abraham now "feels like he owes it to the world to use his skills for betterment of the world." Ex. 7 ████████████.

He is delivering on that commitment. In 2014, Abraham founded Makers4Good, a non-profit organization funded and run primarily by Abraham, which leverages industrial design to better the lives of those less fortunate. PSR ¶ 51; Ex. 5 ████████████. With Makers4Good, Abraham applies his engineering skills "to greater societal issues[,] supporting communities he has never visited and people he will never meet," and "inspir[ing] product designers to make consumer products with a community donation built into the business model." Ex. 17 ████████████.

For example, Makers4Good recently completed the Helio, a portable solar power device designed for people who are not connected to a power grid. Ex. 2 ████████████; Ex. 5 ████████████. The Helio provides light as well as a charge for electronics, allowing for greater communication and access to the digital world. Ex. 5 ████████. Purchases of the Helio in developed countries (*e.g.*, for camping and emergencies) fund donations of the Helio in developing countries. *Id.* Proceeds from sales of the Helio have also allowed Makers4Good to donate funds to One Million Lights, a lighting project in Uganda; Lalafofofo, a solar light and power installation in Tanzania; and Global Brightlight Foundation, which is building household solar systems for an entire village in Guatemala. *Id.* Abraham conceived of the Helio, provided the funding to design and produce it, and encouraged a team of engineers to donate their time and talents to help those less fortunate. *Id.*

Another example of Makers4Good's work is the Recorders4All project. Abraham's team designed a low-cost recorder alternative so that children with hand disabilities (e.g., missing fingers) could learn to play a musical instrument in school. Ex. 5 ████████████.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

Before Makers4Good developed the recorder alternative, the only way for children with hand differences to participate in music class was a custom instrument costing thousands of dollars. *Id.* The alternative was expensive to engineer but is inexpensive to produce, and so far hundreds have been made and shipped to individual children and the organizations that advocate for them. *Id.* Abraham inspired a critical mass of technical talent to use their skills to serve a small community of kids that were otherwise being left out. *Id.*

In 2014, Abraham founded the Farag Family Foundation, which donates to programs that foster creativity, education, and healthy lifestyles. PSR ¶ 51. The Foundation has provided support to Friends for Youth, a children's mentorship non-profit in Redwood City; the Riekes Center, a youth mentorship program in Menlo Park; and Startup Cuba, a group working to expand employment opportunities for Cubans. PSR ¶ 51. With a six-figure donation from Abraham, Santa Clara University purchased a mobile trailer, hired masters students to outfit it with 3D printers and laser-cutters, and currently travels to schools inspiring young minds with design thinking. Ex. 17 ███████████████████. Abraham is "committed to working for good in the world" and spends the majority of his time on charitable endeavors. Ex. 12 ████████████; PSR ¶ 62. He plans to grow both Makers4Good and the Farag Family Foundation, including exploring potential partnerships between Makers4Good and the Sierra Club, the Red Cross, and World Vision.

Abraham also uses his real estate holdings and expertise to better the community. Since 2010, Abraham has provided housing for five clean and sober living facilities in East Palo Alto, San Mateo, and Redwood City. PSR ¶ 51. These facilities house approximately thirty people at a time, all of whom are transitioning from addiction to a more stable life. Abraham helped two housing managers set up and operate their first clean and sober living facilities. As one manager describes, "Abraham was open to the idea when no one else was." Ex. 14 ████████████. Many landlords had rejected the proposal to use their property for a clean and sober living facility, but Abraham "was very excited about the possibility to help those in the community." Ex. 18 ████████████. Abraham's generosity has helped hundreds of people to recover from addiction and other illnesses. Ex. 14 ████████████; Ex. 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1 ██████████████.

2      Abraham has also devoted himself to caring for his children.  Abraham's wife Claudia

3 accepted a job at Google X, a division of Google whose mission is to invent and launch

4 "moonshot" technologies that could make the world a radically better place, such as designing

5 contact lenses that can monitor blood sugar.  Ex. 9 ████████████████████; Ex. 2 ████

6 ████████████.  Claudia loves her work, but her workday begins at 7:00 am, requiring her to

7 retire to bed in the early evening and leave the house early in the morning.  Ex. 9 ████████

8 ████████████.  Abraham decided to reduce his workload in order to care for their three

9 children.  *Id.*  Each day, Abraham wakes up with his children, makes breakfast and packs

10 lunches, addresses any daytime issues (transportation, field trips, illnesses, etc.), helps with

11 homework, and tucks them in at night.  *Id.*  "Abraham has welcomed these responsibilities with

12 heartfelt joy," and his children cannot imagine their lives without his daily presence.  *Id.*

13
14 ## III.     THE SENTENCING FACTORS WARRANT A SENTENCE WELL BELOW THE ADVISORY GUIDELINES RANGE.

15      The Court has broad discretion in determining Abraham's sentence.  Abraham's plea

16 agreement provides for an offense level of 11, carrying a potential sentence of 8-14 months in

17 prison and a fine of $20,000 to $50,000 under the Guidelines.  Dkt. 277, ¶ 8; U.S.S.G. Ch. 5,

18 Pt. A.  The plea agreement further provides for restitution in the amount of $7,000 pursuant to

19 U.S.S.G. § 5E1.1(a).  Dkt. 277, ¶¶ 8-9, 11.  The Guidelines provide a useful starting point in

20 setting the sentence, but they are neither binding nor presumed reasonable.  *United States v.*

21 *Booker*, 543 U.S. 220, 245 (2005); *Nelson v. United States*, 555 U.S. 350, 352 (2009).  Rather,

22 the Court must make an individualized assessment of the appropriate sentence, based on the

23 particular facts of Abraham's case and the factors set forth in 18 U.S.C. § 3553(a).  *See United*

24 *States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008) (en banc).

25      Under 18 U.S.C. § 3553(a), the Court must impose a sentence sufficient, but not greater

26 than necessary, considering:  (1) the nature and circumstances of the offense and the history and

27 characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness

28 of the offense, afford adequate deterrence, protect the public, and provide the defendant with

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   necessary training or care; (3) the kinds of sentences available; (4) the kinds of sentences and the

2   sentencing range established for the applicable category of offense in the Guidelines; (5) any

3   pertinent policy statement in the Guidelines; (6) the need to avoid unwarranted sentence

4   disparities; and (7) the need to provide restitution to victims of the offense.  18 U.S.C. § 3553(a).

5   These factors support a sentence of probation, a $20,000 fine, and $7,000 restitution.  The

6   PSR recommends a sentence of probation.  PSR at 20.

7   ### A.   Mr. Farag's Participation in the Conspiracy Was a Serious Lapse in Judgment in an Otherwise Exemplary Life.

8
9   Despite his tumultuous childhood, Abraham has led an exemplary life.  His intelligence,

    humility, and caring nature allowed him to succeed at MIT, Stanford, Apple, and his

10  entrepreneurial endeavors.  Abraham's colleagues view him as "a supportive boss, mentor,

11  father, and friend; giving freely of his time and talents to help those around him."  Ex. 2 ████

12  ███████.  He "represents many things to the many people in his life; he is an individual

13  of good will, benevolence, and human kindness . . . a supportive colleague and employer that

14  many turn to for guidance and advice[.]"  Ex. 3 ████████████.  He is a devoted

15  father to his three children, and has served as an emotional and "financial anchor" for his parents

16  and brothers.  Ex. 6 ████████████; Ex. 1 ████████████.  His

17  charitable contributions are genuinely exemplary.  Whether opening his home to a friend in need

18  or providing housing for recovering addicts when no one else would, each act demonstrates how

19  much Abraham truly cares about improving the lives of those around him.  *See* Ex. 15 ████

20  ████████████; Ex. 16 ████████████; Ex. 18. ████████████.

21  One such beneficiary of this kindness explained that "Abraham is one of the most generous,

22  caring, and community minded people I know, and [] I might not be here today if it was not for

23  his friendship, compassion, and encouragement."  Ex. 16 ████████████.

24  Abraham is not the type of person who needs a deterrent from committing another crime, as this

25  offense is in no way indicative of the type of man Abraham is known to be.

26  Indeed, Abraham's friends and family are uniformly shocked that Abraham committed

27  this crime.  "The idea that Abraham would be involved in any wrong[-]doing is completely

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   inconsistent" with the honest person and positive influence they know and love.  Ex. 2 ███

2   ████████.  Abraham's family was "shocked to hear about [his] indictment many years

3   ago and have been there to support him the entire time." Ex. 6 ████████████.

4   Friends know Abraham as a man of high integrity and compassion and "can only ascribe this

5   [crime] to a momentary lack of good judgment at the time."  Ex. 4 ████████████;

6   Ex. 12 ████████████.  As a testament to his good character, friends continue to

7   invest their money with Abraham and to seek his counsel regarding real estate transactions.  A

8   friend of over twenty years explains, "[Abraham] told me honestly, right away, about his

9   criminal justice case; it saddened me because it seemed out of character with my experience of

10  him.  I had no reservations about continuing my business relations with his company and still

11  trust their services.  I certainly have no reservations about continuing our personal friendship.  I

12  trust his integrity."  Ex. 15 ████████████.

13          Abraham simply did not handle what the Big Five were doing the right way.  Nor did

14  others.  That mistake has already cost Abraham dearly, as he is the only person not one of, or

15  working for, the Big Five who has had to defend this case from indictment to the present.  He

16  deeply regrets his mistakes and has done all he can to make amends.  As his wife writes:

17  "[T]his 7-year experience of being investigated, indicted, and pleading guilty has greatly

18  humbled Abraham.  Ongoing soul searching caused him to double down on his efforts to be a

19  good person in the world."  Ex. 9 ████████████.  He now "carries the feeling

20  of an obligation to make up for this wrong that he was part of."  Ex. 7 ████████████.

21  His many good works attest to that.

22          A downward departure from the Guidelines is appropriate for a defendant who, like

23  Abraham, has dedicated so much of his life to bettering the lives of others.  *See United States v.*

24  *Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (defendant's good deeds weighed in

25  favor of a lesser sentence); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (affirming

26  sentence of three years' probation with 6 months' home confinement where Guidelines provided

27  for 15-21 months in prison, due to defendant's extraordinary charitable contributions); *United*

28  *States v. Beamon*, 373 F. Supp. 2d 878 (E.D. Wis. 2005) (downward departure from Sentencing

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   Guidelines based on defendant's community service and family circumstances was warranted, in

2   light of his admirable service as a mentor to young men, his assistance to his ill father, and his

3   positive influence on his younger family members).

4       **B.      Similarly Situated Defendants Have Been Sentenced to Probation.**

5           Forty-one pleading defendants have been sentenced for bid-rigging at real estate

6   foreclosure auctions in the East Bay.  Of those, ten had an offense level of 11 in their plea

7   agreement, like Abraham.  ***None*** of the defendants at level 11 who received a Section 5K1.1

8   reduction have been sentenced to prison.  ***None*** of the twenty-two defendants at level 13 have

9   been sentenced to prison, and eight of the level-13 defendants received probation only (no home

10  confinement).  The following chart summarizes the sentences imposed on defendants who pled

11  guilty and agreed to an offense level of 11 or 13:

| Defendant | Case Number | Level | Sentence |
|---|---|---|---|
| Bradley Roemer | 4:15-cr-00229-PJH | 11 | Probation;<br>$10,000 fine;<br>$2,809 restitution |
| Jorge Wong | 4:11-cr-00428-PJH | 11 | Probation;<br>$20,000 fine |
| Thomas Franciose | 4:11-cr-00426-PJH | 11 | Probation;<br>$20,000 fine;<br>$18,204 restitution |
| Irma Galvez | 4:13-cr-00414-PJH | 11 | Probation w/ 6 mos. home confinement;<br>$3,000 fine |
| Eric Larsen | 4:11-cr-00723-PJH | 11 | Probation w/ 6 mos. home confinement;<br>$4,000 fine |
| Gernot Sebastian Zepernick | 4:14-cr-00512-PJH | 11 | Probation w/ 6 mos. home confinement;<br>$6,000 fine |
| Thomas Legault | 4:11-cr-00429-PJH | 11 | Probation w/ 6 mos. home confinement;<br>$20,000 fine;<br>$2,411 restitution |
| Chuokee Bo | 4:13-cr-00730-PJH | 11 | Probation w/ 6 mos. home confinement;<br>$20,000 fine;<br>$13,219 restitution |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Leslie Gee | 4:14-cr-00003-PJH | 11 | 8 months in prison; $7,500 fine; $55,294 restitution *Did not receive 5K1.1 reduction* |
| Ray Yeganeh | 4:15-cr-00339-PJH | 11 | 12 months in prison; $149,733 restitution *Did not receive 5K1.1 reduction and had significant criminal history* |
| Wesley Barta | 4:13-cr-00413-PJH | 13 | Probation; $7,500 fine |
| Charles Rock | 4:14-cr-00607-PJH | 13 | Probation; $4,000 fine; $12,084 restitution |
| Danli Liu | 4:12-cr-00611-PJH | 13 | Probation; $5,000 fine; $21,888.95 restitution |
| Thomas Bishop | 4:14-cr-00001-PJH | 13 | Probation; $20,000 fine; $11,079.60 restitution |
| Stan Kahan | 4:13-cr-00412-PJH | 13 | Probation; $20,000 fine; $12,746 restitution |
| Timothy Powers | 4:11-cr-00722-PJH | 13 | Probation; $20,000 fine; $31,068 restitution |
| Joseph Vesce | 4:13-cr-00415-PJH | 13 | Probation; $21,365 fine; $52,550 restitution |
| Douglas Ditmer | 4:12-cr-00448-PJH | 13 | Probation; $20,000 fine; $91,144 restitution |
| Miguel De Sanz | 4:14-cr-00581-PJH | 13 | Probation w/ 3 mos. home confinement; $26,651 fine; $111,771.32 restitution |
| Grant Alvernaz | 4:11-cr-00432-PJH | 13 | Probation w/ 3 mos. home confinement; $63,272 fine; $6,350 restitution |
| Dominic Leung | 4:12-cr-00083-PJH | 13 | Probation w/ 6 mos. home confinement; $20,700 fine; $45,428.50 restitution |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

| Keith Slipper | 4:12-cr-00447-PJH | 13 | Probation w/ 6 mos. home confinement; $20,000 fine; $58,669 restitution |
| Michael Renquist | 4:13-cr-00143-PJH | 13 | Probation w/ 6 mos. home confinement; $20,000 fine; $239,590.17 restitution |
| Garry Wan | 4:14-cr-00604-PJH | 13 | Probation w/ 8 mos. home confinement; $7,500 fine |
| Mark Roemer | 4:15-cr-00228-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $2,809 restitution |
| Douglas Moore | 4:11-cr-00431-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $9,540 restitution |
| Charles Gonzales | 4:14-cr-00099-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $27,151 restitution |
| Hilton Wong | 4:12-cr-00082-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $40,800 restitution |
| David Margen | 4:11-cr-00425-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $63,114 restitution |
| Jaime Wong | 4:11-cr-00427-PJH | 13 | Probation w/ 8 mos. home confinement; $20,000 fine; $102,429.64 restitution |
| John Shiells | 4:14-cr-00581-PJH | 13 | Probation w/ 8 mos. home confinement; $50,137 fine; $275,389 restitution |
| Peter McDonough | 4:13-cr-00144-PJH | 13 | Probation w/ 9 mos. home confinement; $20,000 fine; $53,300 restitution |

To avoid unwarranted disparities in sentencing, Abraham also should receive a sentence of probation. Like the level-11 and level-13 offenders sentenced to probation, Abraham "do[es] not have a criminal history," "accepted responsibility," "showed a willingness to make restitution," and "cooperated with the Government." Transcript of July 26, 2017 Hearing at 15:4-14, *United States v. Rudolph Silva*, No. 4:14-cr-00002-PJH, ECF No. 46 (Aug. 7, 2017); *see also, e.g.*, Transcript of July 26, 2017 Hearing at 15:13-23, *United States v. Gernot Sebastian*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   *Zepernick*, No. 4:14-cr-00512-PJH, ECF No. 33 (Aug. 7, 2017) ("[F]or those participants who

2   not only accept responsibility for the wrongfulness of their conduct, who express a willingness to

3   make restitution, if appropriate, . . . and who took the additional step of providing cooperation to

4   the Government[,] [i]n these cases, I'm treating them like I would any other first offender cases,

5   in which case I would generally impose a sentence of probation, if I were persuaded that the risk

6   of recidivism was low or nonexistent[.]").

7       The only pleading defendants who have been sentenced to prison in connection with the

8   Bay Area real estate foreclosure cases fall into one of three categories:  (1) they did not receive a

9   Section 5K1.1 reduction (John Galloway, Leslie Gee); (2) they had a significant criminal history

10  (Brian McKinzie); or (3) they did not receive a Section 5K1.1 reduction *and* they had a

11  significant criminal history (Nicholas Diaz, Stephan Florida, Ray Yeganeh).[2]  Abraham is in an

12  entirely different category.

13  **C.    A Sentence of Probation, a $20,000 Fine, and $7,000 Restitution Is Sufficient
        But Not Greater than Necessary.**

14

15      Despite the emphasis in the Guidelines on custodial sentences for certain antitrust

16  offenders, *see* U.S.S.G. § 2R1.1, cmt. 5 & Background, probation is both permissible under the

17  Guidelines (*see* U.S.S.G. § 5B1.1; PSR ¶¶ 71-73) and the most appropriate punishment in

18  Abraham's case.

19

20

_____

21  [2] *See* United States' Sentencing Memorandum, *United States v. John Michael Galloway*, No.
    4:14-cr-00607-PJH, ECF No. 277 (Mar. 8, 2017) (no 5K1.1 motion); United States' Sentencing
22  Memorandum, *United States v. Leslie Gee*, No. 4:14-cr-00003-PJH, ECF No. 40 (Aug. 9, 2017)
    (no 5K1.1 motion); United States' Sentencing Memorandum and Motion for Downward
23  Departure Pursuant to U.S.S.G. § 5K1.1 at 2, *United States v. Brian McKinzie*, No. 4:11-cr-
    00424-PJH, ECF No. 100 (Sept. 27, 2017) (Probation Office calculated defendant's criminal
24  history as V based on alcohol-related convictions); United States' Sentencing Memorandum,
    *United States v. Nicholas Diaz*, No. 4:14-cr-00607-PJH, ECF No. 272 (Mar. 1, 2017) (no 5K1.1
25  motion; Probation Office calculated defendant's criminal history as II based on alcohol-related
    convictions); United States' Sentencing Memorandum, *United States v. Stephan Florida*, No.
26  4:14-cr-00582-PJH, ECF No. 408 (Jan. 4, 2017) (no 5K1.1 motion; Probation Office calculated
    defendant's criminal history as II based on drug-related convictions); United States' Sentencing
27  Memorandum, *United States v. Ramin Rad "Ray" Yeganeh*, No. 4:15-cr-00339-PJH, ECF No.
    101 (Mar. 1, 2017) (no 5K1.1 motion; Probation Office calculated defendant's criminal history
28  as II, including prior convictions for foreclosure-related fraud and contempt of court).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1    First, a custodial sentence would have a "devastating ripple effect" on Abraham's family

2    and the community.  Ex. 19 ███████████████████████; *see United States v. Cox*, 271 F.

3    Supp. 3d 1085, 1088-89 (S.D. Iowa 2017) (concluding that courts "cannot simply ignore the best

4    interests of a defendant's family and the defendant's responsibilities to his or her family" when

5    crafting a sentence sufficient but not greater than necessary to fit an offender's crime).  Abraham

6    is the primary caregiver for his three children, Fiona, Otto, and Niles.  Each day, he wakes them

7    for school, makes their breakfast and packs their lunches, transports them to after-school

8    activities, helps them with their homework, and tucks them in at night.  Ex. 9 █████████

9    ██████████████.  This allows Abraham's wife Claudia to work fulltime at a job she truly

10   loves.  *Id.*; PSR ¶ 52.  If Abraham were sentenced to prison, "the punishment would fall heavily

11   on his wife and children and it could irreparably harm his three children during a very significant

12   developmental stage in their lives."  Ex. 12 ████████████████; *see also United States v.*

13   *Lehmann*, 513 F.3d 805, 809 (8th Cir. 2008) (affirming sentence of probation for defendant after

14   expert testified that a prison term would negatively impact the emotional development of the

15   defendant's young son).  With Abraham in custody, his brother Aladdin, his father Shawky and

16   stepmother Azza, and his half-brothers Omar and Amear could no longer rely on Abraham for

17   the significant emotional and financial support he now provides.  And, of course, countless

18   individuals would suffer if Abraham were not able to continue his work engineering power

19   sources for developing communities, designing instruments for children with hand disabilities,

20   supporting youth mentorship programs and local schools, providing housing for clean and sober

21   living facilities, and generally "making the world better for all of us."  Ex. 4 ██████████

22   ████████████.  Abraham "has many more positive contributions to make to society," Ex. 16

23   ████████████████████, and "[a]nything that prevents him from his ongoing work to the

24   public benefit will harm [the] broader community."  Ex. 5 ████████████████████.

25       Second, this case already has severely impacted Abraham's life.  For nearly seven years,

26   Abraham has suffered the shame of investigation and indictment, the emotional and financial

27   stress of litigation, years of "speculation, judgment, [and] gossip," and anxiety due to the

28   possibility of being separated from his wife and children.  Ex. 19 ████████████████

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1  ██████████; Ex. 6 ████████████████████.  In 2013, Abraham resigned from Sparkfactor

2  because his involvement in the case caused the firm to lose current and potential clients.  PSR

3  ¶ 64; Ex. 5 █████████████████████████; Ex. 9 ████████████████████████.  Without new

4  business, Sparkfactor ran out of work, forcing Abraham to find other jobs for many of his

5  engineers.  Ex. 9 ██████████████████████.  Abraham's real estate business suffered as

6  well.  Banks closed his accounts, title companies refused to work with him, tenants were

7  reluctant to rent from him, and he could not refinance or obtain new loans.  *Id.*  In 2015,

8  Abraham resigned from Working Dirt so that the business and its employees and investors would

9  not continue to suffer as a result of his mistake.  PSR ¶ 64.

10       Third, Abraham has no relevant criminal history and fully complied with the conditions

11  of his pretrial release.  Without question, Abraham is an asset to his community, not a danger.

12  The Sentencing Commission recognizes that first-time offenders like Abraham pose the lowest

13  risk of recidivism.  U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A*

14  *Comprehensive Overview*, at 18 (2016), *available at* http://www.ussc.gov/research/research-

15  publications/recidivism-among-federal-offenders-comprehensive-overview.  Indeed, the

16  Commission is currently considering an amendment that would reduce the offense levels of first-

17  time offenders and increase the availability of alternatives to incarceration for defendants at the

18  lower levels of the sentencing table.  U.S. Sentencing Comm'n, *Proposed Amendments to the*

19  *Sentencing Guidelines*, at 20-37 (Aug. 25, 2017), *available at* https://www.ussc.gov/sites/default/

20  files/pdf/amendment-process/reader-friendly-amendments/20170824_rf_proposed.pdf; U.S.

21  Sentencing Comm'n, Public Hearing on Proposed Amendments to the Federal Sentencing

22  Guidelines (Mar. 14, 2018), *available at* https://www.ussc.gov/policymaking/meetings-

23  hearings/public-hearing-march-14-2018.  A first-time, low-level offender like Abraham, who is

24  the primary caregiver for three children, supports the local and global communities with his time

25  and talent, and deeply regrets his limited participation in the bid-rigging conspiracy, is not

26  someone who belongs in prison.

27       Finally, a felony record and a sentence of probation are significant punishment.  Public

28  comment to the proposed amendment for first-time offenders emphasizes the punitive effect

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1   probation can have.  "Probation is a severe punishment: it places substantial restrictions on a

2   person's liberty; may require home detention, community confinement, and community service;

3   and places the person at risk of imprisonment for a minor technical violation."  Fed. Defender

4   Sentencing Guidelines Comm., Reply Public Comment on Proposed 2017 Holdover

5   Amendments at 6 (Nov. 6, 2017), *available at* https://www.ussc.gov/sites/default/files/

6   pdf/amendment-process/public-comment/20171010Reply/FPD.pdf; *see also Gall v. U.S.*, 552

7   U.S. 38, 48 (2007) (noting that offenders on probation are subject to several standard conditions

8   that "substantially restrict their liberty"); *U.S. v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in

9   the very nature of probation is that probationers do not enjoy the absolute liberty to which every

10  citizen is entitled") (internal quotations omitted).   The felony conviction itself is also punitive,

11  given the significant collateral consequences that result from a conviction.  *Id.*  A sentence of

12  probation is appropriate for a first-time, low-level offender like Abraham and it will without

13  question serve as a significant punishment.

14  **IV.    MR. FARAG PROVIDED SUBSTANTIAL ASSISTANCE TO THE**
        **GOVERNMENT.**
15

16      The Government plans to file a Section 5K1.1 motion in this case.  The Guidelines

17  provide that, upon a motion by the Government stating that the defendant has provided

18  substantial assistance in an investigation or prosecution, the Court may depart from the

19  Guidelines.  U.S.S.G. § 5K1.1.  To determine the appropriate departure, the Court may consider

20  factors such as the significance and usefulness of the defendant's assistance; the truthfulness,

21  completeness, and reliability of the information provided; the nature and extent of the

22  defendant's assistance; and the timeliness of the defendant's assistance.  *Id.* § 5K1.1(a).

23      Abraham's decision to plead guilty, and the information he subsequently provided to the

24  Government, were significant.  Shortly after Abraham decided to plead, the two remaining non-

25  pleading defendants, Joe Giraudo and Kevin Cullinane, also decided to plead.  Giraudo and

26  Cullinane pled open, which means that their sentencing—including the application of

27  adjustments such as the aggravating role adjustment under U.S.S.G. § 3B1.1—will be contested.

28  *See* Dkts. 263, 265.  During a lengthy interview on November 27, 2017, Abraham provided the

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

Government with information relevant to the sentencings of Giraudo and Cullinane, including:
(1) the deal Giraudo struck in 2003 regarding a property on Garden Street, establishing
Giraudo's long-term leadership role in bid-rigging at the San Mateo County auctions;
(2) Giraudo's knowledge of the auctions, influence over other bidders, and access to capital;
(3) Giraudo's supervision of Jim Appenrodt; (4) Giraudo's exercise of control and influence over
Abraham, Mr. Appenrodt, and Mo Rezaian with respect to a property located at 3050 Edison;
(5) Giraudo's habit of bidding up properties when he was mad at someone, making it too costly
for that person to purchase the property even though Giraudo would not make money from it;
(6) Cullinane's ability to be in on a deal even when he was not present at the auction; and
(7) Abraham's reluctant agreement to buy Cullinane's share of the property at 1719 Sweetwood,
for fear of jeopardizing future partnerships with the Big Five.  *See generally* Ex. 20 (NDRE-FBI-
I-002975).  This information, which was provided in connection with a contested sentencing,
constitutes substantial assistance under Section 5K1.1.

Although he was not among the first defendants to plead guilty, Abraham pled at the first
reasonable opportunity.  Prior to indictment, the Government insisted that Abraham plead to both
bid-rigging and mail fraud.  Abraham's counsel determined that the alleged conduct did not
constitute mail fraud as a matter of law and refused to enter a plea to mail fraud, which carried a
far longer potential sentence than bid-rigging.  This determination was correct.  Two years after
indictment—and after Judge Hamilton granted a motion to dismiss the mail fraud charges in the
East Bay cases—the Government finally dismissed the mail fraud charges against Abraham.
Pretrial Order No. 1 at 1-11, *United States v. Galloway et al.*, No. 4:14-cr-00607-PJH, ECF No.
139 (Aug. 15, 2016) (dismissing mail fraud counts); Dkt. 178 (granting Government's motion to
dismiss mail fraud counts and forfeiture allegations).

By that time, Abraham's counsel had learned that the charges against him were based in
part on more than 200 hours of unauthorized electronic surveillance, collected when the FBI
planted hidden microphones around the entrance to the San Mateo County Courthouse.  *See*
Dkt. 150 (order granting motion to suppress).  Abraham argued that the entire case against him
was tainted by this violation of the Fourth Amendment and Title III.  *See* Dkts. 231, 232, 240.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB

1    When the Court rejected this argument, Abraham promptly pled guilty.  Abraham should not be

2    punished for fighting legally insufficient mail fraud charges and insisting that the Government

3    establish its case was not tainted by Fourth Amendment and Title III violations that lasted for

4    nine months.  *See* Transcript of Jan. 11, 2017 Hearing at 19:21-24, *United States v. Stephan*

5    *Florida*, No. 4:14-cr-00582-PJH, ECF No. 452 (Apr. 20, 2017) ("[There] should be no additional

6    punishment because your client took the time to try to get out from under the mail fraud charges

7    before actually entering into a plea.").

8    **V.      CONCLUSION**

9            For the foregoing reasons, Mr. Farag respectfully requests that the Court impose a

10   sentence of probation, a $20,000 fine, and $7,000 restitution.

11

12   DATED: April 19, 2018                        Respectfully submitted,

13                                         By   /s/ Daniel M. Wall
                                               Daniel M. Wall (Bar No. 102580)
14                                             Ashley M. Bauer (Bar No. 231626)
                                               Colleen E. Heyler (Bar No. 313036)
15                                             LATHAM & WATKINS LLP
                                               505 Montgomery Street, Suite 2000
16                                             San Francisco, CA 94111-6538
                                               Telephone: (415) 391-0600
17                                             Fax: (415) 395-8095
                                               dan.wall@lw.com
18                                             ashley.bauer@lw.com
                                               colleen.heyler@lw.com
19
                                               *Attorneys for Defendant Abraham S. Farag*
20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

DEFENDANT ABRAHAM FARAG'S
SENTENCING MEMORANDUM
CASE NO. CR 14-00534-CRB