ANDREW MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
michael.rabkin@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABRAHAM S. FARAG,<br><br>Defendant. | CASE NO. 14-CR-00534-CRB-5<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K1.1** |

The United States respectfully requests that this Court sentence defendant ABRAHAM S. FARAG to (1) serve seven months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $2,000, a $100 special assessment, and $7,000 in restitution. This sentencing recommendation is based on the government's motion for a downward departure of 10 percent from the low end of the Guidelines range for substantial assistance and is consistent with the parties' plea agreement.

//

# BACKGROUND

Defendant Abraham S. Farag is charged with participating in the bid-rigging conspiracy in San Mateo County, which began no later than August 2008 and continued until January 2011. Presentence Report ("PSR") ¶ 15. Farag began attending auctions in late 2009 and was participating in the conspiracy by early 2010. *Id.* His involvement in the conspiracy continued until January 2011. *Id.*

Unlike some of the other conspirators, Farag was not surprised that bid rigging was occurring at the auctions when he began attending in 2009. *Id.* ¶ 16. In 2003, Farag attended a San Mateo auction to purchase a property located next door to his residence in East Palo Alto. At that auction, co-conspirator Joseph Giraudo approached Farag and told him he could purchase the property if Farag paid him $4,000 not to bid against him. *Id.* Farag accepted Giraudo's offer. *Id.* Farag did not resume attending the auctions again until 2009. *Id.*

Farag was primarily interested in purchasing properties located in East Palo Alto, and he used an entity called Working Dirt, which he had formed in 2005, to purchase properties at the auctions. *Id.* ¶ 17. He also cultivated a relationship with the "Big 5," a group of the five most dominant bidders at the auction, but he was never accepted as a member of that group. *Id.* Once he began attending the auctions regularly, Farag participated in payoff agreements. *Id.*

For example, Farag purchased a property located at 2247 Terra Villa Street in East Palo Alto after making an agreement to pay Giraudo, Daniel Rosenbledt, and Mohammed Rezaian $10,000 not to bid against him. *Id.* ¶ 18. Likewise, Farag and an unindicted co-conspirator purchased a property located at 1121 Menlo Oaks Drive in Menlo Park pursuant to a $12,000 payoff agreement. *Id.* Pursuant to that agreement, Farag and the unindicted co-conspirator paid Giraudo, Grinsell, Rezaian, Rosenbledt, and Robert Williams not to bid on the property. *Id.*

Farag also received payments not to bid. *Id.* ¶ 19. For example, Farag received $4,000 (of a $20,000 total payoff) not to bid against competitors at the auction for a property located at 1177 Alameda de las Pulgas in Redwood City. *Id.* Rosenbledt also indicated that he paid Farag on more than one occasion to not bid against him or the Big 5. *Id.*

//

Ultimately, Farag was involved in eight payoff agreements, and his volume of commerce is $928,087.[1]  *Id.* ¶ 20.  The volume of commerce does not reflect the bid rigging agreements that Farag participated in for which he received payoff money.  Farag received $7,000 in payoffs for agreeing not to bid on three properties.  *Id.*

On October 22, 2014, Farag was indicted on one count of bid rigging and two counts of mail fraud.  Dkt. 1.  On October 25, 2017, Farag pleaded guilty to the bid-rigging count.[2]  Dkt. 277.

## ARGUMENT

### A.  Sentencing Guidelines Calculations

#### 1.  Criminal History

In Paragraph 12 of the plea agreement, the parties agree that Farag's Criminal History Category is determined by the Court.  The Presentence Report (PSR) calculates Farag's Criminal History Category as I, based on minimal criminal history.  PSR ¶¶ 36-39.

#### 2.  Offense Level

The PSR calculates the total offense level as 11, consistent with the plea agreement.  PSR ¶ 34.  This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, and a downward reduction of two levels for acceptance of responsibility.  PSR ¶¶ 26-34.  U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 2R1.1(b)(2)(A), and 3E1.1(a) (U.S. Sentencing Comm'n 2016).

Under the Sentencing Guidelines, an offense level of 11 and Criminal History Category of I results in a sentence ranging from 8 to 14 months of imprisonment.

#### 3.  Fine and Restitution

The PSR calculates a fine range of $20,000 to $46,394.  PSR ¶ 76; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce, but not less than $20,000).  In the plea agreement, the government agreed to recommend a fine between $2,000

---

[1] Unlike most of the other defendants who pleaded guilty pursuant to plea agreements, Farag has not stipulated to a specific volume of commerce.  Rather, the government and Farag have agreed that his volume of commerce does not exceed $1 million.

[2] On October 13, 2016, the mail-fraud counts against Farag were dismissed on the government's motion.  Dkt. 178.

U.S.' SENT'G MEMO                                                     3
*United States v. Farag*, No. 14-CR-00534-CRB-5

and $20,000. Dkt. 277. In conjunction with its custodial recommendation, the government recommends a $2,000 fine.

The government recommends restitution in the amount of $7,000, consistent with the plea agreement. *Id.*

### B. Basis for Downward Departure for Substantial Assistance

Pursuant to Section 5K1.1 of the Guidelines, the government moves for a downward departure for substantial assistance to the investigation. The government recommends a 10 percent reduction from the low end of the Guidelines range of eight months, resulting in a sentence of seven months.

The timing, significance, nature and extent of Farag's cooperation warrant a 10 percent reduction. Farag was the last individual to plead guilty, and his October 25, 2017 plea was over three years after he was indicted. Farag sat for a single interview with the FBI in November 2017. During his interview, Farag provided corroborating information regarding the operation of the conspiracy, the conduct of other conspirators, and various bid-rigging agreements.

For these reasons, a 10 percent downward departure for substantial assistance to the investigation and prosecution of these cases is appropriate.

### C. Sentencing Recommendation

The government's recommendation of seven months is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. The Court's sentence must reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally.

Given the magnitude of the financial harm caused by Farag's conduct, the government's recommendation, which includes a custodial term, is appropriate and consistent with the commentary in the applicable Guidelines. The commentary to the Guidelines makes clear that "prison terms for [Antitrust] offenders should be . . . common" and "alternatives such as community confinement [should] not be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1, cmt. n. 5 & Background. Given Farag's substantial assets, a fine alone—in the absence of a custodial term—would not serve as an adequate deterrent.

This was a serious, far-reaching crime. Farag was a member of a criminal conspiracy that corrupted a fair and competitive process meant to compensate mortgage holders, homeowners, and other beneficiaries following a home foreclosure. Instead, that process was exploited for the personal enrichment of Farag and his co-conspirators. This conduct was especially harmful given its timing during the foreclosure crisis in the late 2000s. It bred distrust in the auction process and discouraged investors outside of the conspiracy from attending the auctions to purchase foreclosed properties. And the fact that the conspiracy was carried out at or near the steps of local courthouses was especially egregious.

Farag did not originate the conspiracy, but he knew about the bid rigging before he began attending the auctions in 2009 and nonetheless joined in willingly. Furthermore, while Farag was never accepted as a member of the Big 5, it was not for lack of trying; Farag cultivated a relationship with the Big 5—by far the most culpable group among all of the conspirators.

The proposed sentence also takes into account the need for deterrence. Antirust crimes are often hard to detect, taking place in the context of conspiracies that leave few physical clues. In this case, the investigation into the corruption at the foreclosure auction took years to piece together. The potential for evading law enforcement and the resources required to investigate and prosecute such a conspiracy increases the need for tangible penalties to serve as a deterrent; otherwise, the potential financial upside and low likelihood of getting caught makes engaging in this type of criminal conduct even more enticing. The pervasive nature of this conspiracy also increases the need for deterrence. Dozens of investors thoroughly corrupted the auctions in multiple counties for over two years, recruiting new members, intimidating newcomers, and assuming—as Farag likely did, especially given his highly-educated background—that they would never be held accountable for rampant bid rigging. Sentences commensurate with the Guidelines will send a clear message across the industry, including to those who might otherwise perceive themselves as beyond the reach of the law, that bid rigging is unacceptable.

Probation recommends a dramatic variance from Farag's Guidelines calculations that would cut his term of incarceration down to zero—eight months less than the low end of the Guidelines range. As discussed above, a variance is not warranted, especially given the

U.S.' SENT'G MEMO                                             5
*United States v. Farag*, No. 14-CR-00534-CRB-5

magnitude of the financial harm caused by Farag's conduct.  A seven-month sentence adequately reflects Farag's history and characteristics, including his eventual decision to accept responsibility and his willingness to pay restitution and cooperate in the investigation, while also accounting for the seriousness of the offense and the need to provide adequate deterrence.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the government's motion for a downward departure of 10 percent from the low end of the Guidelines range for substantial assistance and sentence defendant Abraham S. Farag to (1) serve seven months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $2,000, a $100 special assessment, and $7,000 in restitution.

Dated:  April 19, 2018                    Respectfully submitted,

/s/
MICHAEL RABKIN
Trial Attorney
United States Department of Justice
Antitrust Division